**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-2379**

NANCY A. HARRISON,

             Plaintiff - Appellant,

      v.

WELLS FARGO BANK, N.A.; WELLS FARGO AND COMPANY DISABILITY
PLAN,

             Defendants - Appellees.

-------------------------------------

SECRETARY OF LABOR,

             Amicus Supporting Appellant.

Appeal from the United States District Court for the Eastern
District of Virginia, at Richmond.  James R. Spencer, Senior
District Judge.  (3:13-cv-00279-JRS)

Argued:  October 28, 2014        Decided:  December 5, 2014

Before WILKINSON and KING, Circuit Judges, and HAMILTON, Senior
Circuit Judge.

Reversed and remanded by published opinion.  Judge Wilkinson
wrote the opinion, in which Judge King and Senior Judge Hamilton
joined.

**ARGUED**: Richard F. Hawkins, III, THE HAWKINS LAW FIRM, PC,
Richmond, Virginia, for Appellant.  Dana Lewis Rust,

MCGUIREWOODS LLP, Richmond, Virginia, for Appellees. Gail A. Perry, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Supporting Appellant. **ON BRIEF:** Summer L. Speight, MCGUIREWOODS LLP, Richmond, Virginia, for Appellees. M. Patricia Smith, Solicitor of Labor, G. William Scott, Acting Associate Solicitor for Plan Benefits Security, Elizabeth Hopkins, Counsel for Appellate and Special Litigation, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Supporting Appellant.

_____

WILKINSON, Circuit Judge:

Nancy Harrison brought suit against her employer Wells Fargo, arguing that the company improperly terminated her short-term disability benefits while she was undergoing a series of treatments for thyroid disease. The district court upheld Wells Fargo's decision, finding the plan administrator did not abuse its discretion in denying Harrison's claim. However, because Wells Fargo failed to consider readily available material evidence of which it was put on notice, the review process failed to conform to the directives of ERISA and the Plan's own terms. We thus reverse and remand to the district court with directions to return the case to Wells Fargo for a full and fair review of Harrison's claims.

I.

A.

Wells Fargo hired Nancy Harrison as an Online Customer Service Representative in 2008. In this role, she was responsible for assisting customers with a wide range of inquiries related to online financial products and services. Her work was primarily sedentary in nature but required her to keep up in a "fast paced environment" and "adequately maintain service levels" for customers. J.A. 203. She was also required to work ten hours a day for four consecutive days while sitting for 97% of that time.

3

In May 2011, Harrison's doctor discovered she had an enlarged thyroid and a large mass extending into her chest that was causing her to suffer chest pain and tracheal compression. Harrison underwent a bronchoscopy on June 9, 2011, and a thyroidectomy on August 17, 2011. She was unable to work and received short-term disability benefits under a plan offered by her employer. As part of her claim, she provided documentation and contact information for her primary care doctor, Dr. Mark Petrizzi, her Ear, Nose & Throat doctor, Dr. Daniel Van Himbergen, and her thoracic surgeon, Dr. Darius Hollings. Although she needed a second surgical procedure to remove the remaining mass in her chest, her benefits were terminated on September 10, 2011, just three weeks after her thyroidectomy. Wells Fargo adjudged this to be the normal period of recovery from this sort of operation.

While Harrison was facing her surgeries, her husband died unexpectedly, triggering a recurrence of depression and post-traumatic stress disorder (PTSD) related to the death of her mother and her children in a house fire in 2004. Her primary care physician, Dr. Petrizzi, doubled her dosage of anti-depressants and referred her to a psychologist, Dr. R. Glenn, for additional treatment. After her thyroidectomy, Harrison also reported pain in her right shoulder for which Dr. Petrizzi prescribed home-based physical therapy.

4

Although the doctor was able to remove Harrison's thyroid during the August 17, 2011, procedure, it was a difficult surgery and he was unable to remove the entire mass in her chest. One week after the operation, Harrison notified Wells Fargo that she was scheduled for another more serious procedure, a median sternotomy, on October 31, 2011, where Dr. Hollings would cut open her chest to remove the remaining tissue. However, on September 10, 2011, Wells Fargo found that she had fully recovered from the thyroidectomy, deemed her fit to return to work, and discontinued her short-term disability benefits.

The parties do not dispute that Harrison was properly granted benefits during the period from her bronchoscopy (June 9, 2011) through her arguable recovery from the thyroidectomy (September 10, 2011) nor do they dispute that she would have been eligible for benefits following the October 31st sternotomy had she gone back to work in the interim. The only dispute is whether Harrison was properly denied benefits from September 10, 2011, to October 31, 2011.[*]

---

[*] Employees must return to work once Wells Fargo determines they are no longer disabled in order to be eligible for future benefits under the terms of the Plan. Because she did not return to work after Wells Fargo found her sufficiently recovered on September 10, 2011, Harrison was denied benefits for the October 31st surgery and subsequent recovery period. If benefits were improperly denied for the disputed period between the surgical procedures, the entire period from June 9, 2011, through her recovery from the sternotomy may be considered a single period (Continued)

B.

The Short-Term Disability (STD) Plan ("the Plan"), provided by Wells Fargo to its employees, entitles employees to salary replacement benefits where a "medically certified health condition" renders an employee "unable to perform some or all of [his or her] job duties for more than seven consecutive days." Id. at 477. The Plan defines a medically certified health condition as a disabling injury or illness that is "documented by clinical evidence as provided and certified by an approved care provider . . . includ[ing] medical records, medical test results, physical therapy notes, mental health records, and prescription records." Id. at 480. Such condition must also "prevent [the employee] from performing the essential functions of [his or her] own job as regularly scheduled." Id.

The Plan is self-funded by Wells Fargo and Liberty Life Assurance Company of Boston serves as the claims administrator. After an employee submits a claim for disability benefits, Liberty must notify the claimant of the decision either to approve or deny benefits. At the time of a denial, Liberty must include the reasons why the claim was denied and, if applicable, any additional information that is needed. The Plan provides for

of disability and she may be eligible to recover benefits from October 31, 2011, through mid-December 2011 as well.

6

a two-level appeals process. Employees who believe their claims were improperly denied may file a first-level appeal with Liberty. If Liberty denies this appeal, claimants may file a second-level appeal directly with Wells Fargo. If Wells Fargo denies the second-level appeal, that decision is considered final and claimants may file suit under Section 502(a) of ERISA. See J.A. 485-87; see also, 29 U.S.C. § 1132.

Following Liberty's initial denial of benefits, Harrison, acting pro se, sought a first-level appeal with Liberty, the claims administrator. In her appeal, she noted that she continued to have chest pain from her recent thyroid surgery and had suffered emotional trauma from the death of her husband. Her primary care physician, Dr. Petrizzi, provided additional documentation to that effect. Harrison also noted that she had an appointment to see Dr. Glenn, a psychologist, with regard to her mental health condition and provided contact information for Drs. Petrizzi, Hollings (her thoracic surgeon), and Glenn (her psychologist). A nurse case manager reviewed her file, and on November 28, 2011, Liberty upheld the denial of her claim.

Harrison, again acting pro se, filed a second-level appeal with Wells Fargo under the terms of the Plan. She provided documentation from Drs. Petrizzi and Hollings as well as a detailed letter from her sister who was her primary caretaker outlining her continuing pain, disability, and severe panic

7

attacks. Wells Fargo, as part of the second-level appeal, sought two independent peer reviews -- one of Harrison's physical disability claims by Dr. Dan Gerstenblitt and another of her psychological disability claim by Dr. A.E. Daniel.

Dr. Daniel contacted Dr. Petrizzi regarding Harrison's mental health, but did not contact Dr. Glenn despite being referred to him by Dr. Petrizzi. In his review, Dr. Daniel concluded that while there was evidence in the record to suggest that the loss of her husband could have triggered PTSD caused by the death of her mother and children, "[i]n the absence of psychiatric/psychological records or telephone conference with her psychologist, an opinion as to whether her psychiatric status limited her functional capacity cannot be provided." Id. at 394. On May 4, 2012, Wells Fargo rendered a final decision, upholding the denial decision.

Harrison brought suit under 29 U.S.C. § 1132 of the Employee Retirement Income Security Act (ERISA) in the Eastern District of Virginia arguing that Wells Fargo abused its discretion in denying her short-term disability benefits. Wells Fargo moved for summary judgment. The district court found there was insufficient evidence of disability under the Plan to conclude that Wells Fargo had abused its discretion in denying Harrison's claim. This appeal followed.

8

Harrison contends on appeal that Wells Fargo substantively abused its discretion in rejecting her claim between her surgical procedures, at a time when she continued to have pain and other complications from the mass in her chest. See Appellant's Br. at 31. In addition, she argues that Wells Fargo's denial was procedurally flawed because the plan administrator neither considered records from Dr. Glenn nor specifically explained to her that such records were necessary to perfect her claim. Because we find that Wells Fargo did not meet the "full and fair review" requirements imposed by ERISA in 29 U.S.C. § 1133, we reverse and remand to the district court with instructions to return the case to Wells Fargo.

## II.

We review the district court's grant of summary judgment to Wells Fargo de novo. See Williams v. Metro Life Ins. Co., 609 F.3d 622, 629 (4th Cir. 2010). We apply the same standards employed by the district court when considering the plan administrator's decision. Id. Because the Plan language gives the plan administrator "full discretionary authority," J.A. 504, we consider whether Wells Fargo abused its discretion in denying Harrison's claim, see Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 321 (4th Cir. 2008).

This circuit has identified "eight nonexclusive factors for courts to consider in evaluating whether a plan administrator

abused its discretion." Helton v. A.T. & T. Inc., 709 F.3d 343, 353 (4th Cir. 2013). Those factors, enunciated in Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan are:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

201 F.3d 335, 342-43 (4th Cir. 2000). In considering these factors, we hold that Wells Fargo failed to meet its statutory and Plan obligations to Harrison as a beneficiary. By failing to contact Dr. Glenn when it was on notice that Harrison was seeking treatment for mental health conditions and when it had his contact information, as well as properly signed release forms from Harrison, the plan administrator chose to remain willfully blind to readily available information that may well have confirmed Harrison's theory of disability.

III.

The Employee Retirement Income Security Act of 1974 (ERISA) governs the short-term benefits plan offered by Wells Fargo. In 29 U.S.C. § 1104 Congress charged plan administrators to act as fiduciaries for purposes of "providing benefits to participants

10

and their beneficiaries" and for "defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). Plan administrators like Wells Fargo thus have a fiduciary duty to beneficiaries like Harrison. Id. As part of this duty, ERISA requires a balance between "the obligation to guard the assets of the trust from improper claims, as well as the obligation to pay legitimate claims." LeFebre v. Westinghouse Elec. Corp., 747 F.2d 197, 207 (4th Cir. 1984) overruled by implication on other grounds by Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003); see also Evans, 514 F.3d at 326 ("For more than thirty years, then, courts have balanced the need to ensure that individual claimants get the benefits to which they are entitled with the need to protect employees . . . from a contraction in the total pool of benefits available.").

A.

However, Congress did not leave the process of balancing these interests solely to the judgment of plan administrators. Rather, ERISA imposes on trustees a number of procedural requirements relevant to the denial of claims. For example, section 1133 requires plan administrators, where any claim for benefits under the plan is denied, to set forth "the specific reasons for such denial." 29 U.S.C. § 1133(1). In addition, ERISA requires that plans provide claimants with a "reasonable opportunity . . . for a full and fair review by the appropriate

11

named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2).

While the primary responsibility for providing medical proof of disability undoubtedly rests with the claimant, a plan administrator cannot be willfully blind to medical information that may confirm the beneficiary's theory of disability where there is no evidence in the record to refute that theory. See Gaither v. Aetna Life Ins. Co., 394 F.3d 792, 807 (10th Cir. 2004). ERISA does not envision that the claims process will mirror an adversarial proceeding where "the [claimant] bear[s] almost all of the responsibility for compiling the record, and the [fiduciary] bears little or no responsibility to seek clarification when the evidence suggests the possibility of a legitimate claim." Id. Rather, the law anticipates, where necessary, some back and forth between administrator and beneficiary.

An administrator is also "required to use a deliberate, principled reasoning process and to support its decision with substantial evidence." McKoy v. Int'l Paper Co., 488 F.3d 221, 223 (4th Cir. 2007). A complete record is necessary to make a reasoned decision, which must "rest on good evidence and sound reasoning; and . . . result from a fair and searching process." Evans, 514 F.3d at 322-23. A searching process does not permit a plan administrator to shut his eyes to the most evident and

12

accessible sources of information that might support a successful claim. As the Tenth Circuit explained, "[a]n ERISA fiduciary presented with a claim that a little more evidence may prove valid should seek to get to the truth of the matter." Gaither, 394 F.3d at 808.

It is not asking too much that, in the course of a "full and fair review," see 29 U.S.C. § 1133, administrators notify a claimant of specific information that they were aware was missing and that was material to the success of the claim. A similar and limited rule has been recognized by a number of our sister circuits. See Harden v. Am. Express Fin. Corp., 384 F.3d 498, 500 (8th Cir. 2004) ("In the limited circumstances of this case, we conclude that [the plan administrator's] failure to obtain Social Security records amounted to a serious procedural irregularity that raises significant doubts about [the] decision."); Quinn v. Blue Cross and Blue Shield Assoc., 161 F.3d 472, 476 (7th Cir. 1998) ("We agree that [trustee] was under no obligation to undergo a full-blown vocational evaluation of [claimant's] job, but she was under a duty to make a reasonable inquiry into the types of skills [claimant] possesses and whether those skills may be used at another job.") abrogated on other grounds by Hardt v. Reliance Standard Life Ins. Co., 560 U.S. 242 (2010); Booton v. Lockheed Med. Benefits Plan, 110 F.3d 1461, 1463 (9th Cir. 1997) ("In simple English,

13

what this regulation calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries.").

We do, of course, recognize that plan administrators possess limited resources, and that there are practical constraints on their ability to investigate the volume of presented claims. The rule is one of reason. Nothing in our decision requires plan administrators to scour the countryside in search of evidence to bolster a petitioner's case. The Gaither decision was similarly cautious. See 394 F.3d at 804 ("[N]othing in ERISA requires plan administrators to go fishing for evidence favorable to a claim when it has not been brought to their attention that such evidence exists."); see also Vega v. Nat'l Life Ins. Servs., Inc., 188 F.3d 287, 298 (5th Cir. 1999) (en banc) (declining to place "the burden solely on the administrator to generate evidence relevant to deciding the claim"), overruled on other grounds by Metro. Life Ins. Co. v. Glenn, 554 U.S. 105 (2008).

The law in this circuit has likewise been clear that there is no open-ended duty for plan administrators to "look all over. . . for a doctor whose testimony might contradict the medical reports from reliable physicians that ha[ve] been submitted." LeFebre, 747 F.2d at 208. In Berry v. Ciba-Geigy Corp., 761 F.2d 1003, 1008 (4th Cir. 1985), we also noted that plan trustees are not "under any duty to secure evidence

14

supporting a claim for disability benefits when those trustees had in their possession reliable evidence that a claimant was not, in fact, disabled." And in Elliott v. Sara Lee Corp., 190 F.3d 601, 608 (4th Cir. 1999), we held that a claimant who did not submit supplemental evidence to disprove the existing record showing that she was not disabled, "[could not then] prevail on an argument that [her employer] had insufficient evidence to make a reasoned decision."

In these cases, however, there was sufficient evidence in the existing record to refute claimant's theory of disability. In LeFebre, there was evidence that the plaintiff, who claimed total disability due to blindness, was nonetheless driving on his own and able to perform most of his job duties. 747 F.2d at 205. In Berry, the plan administrator "possessed letters from claimant, claimant's lawyer, and claimant's doctor stating that [he] was ready to resume his employment." 761 F.2d at 1008. Similarly, in Elliott, claimant's treating physicians submitted statements that "her degree of impairment was 35 to 55 percent and that she was capable of clerical or administrative activity" and thus did not meet the plan's definition of totally disabled. 190 F.3d at 604. We agree that a plan administrator is not "under any duty to secure evidence [to the contrary]" under such circumstances. Berry, 761 F.2d at 1008.

15

Harrison's claim, however, is distinguishable from the above cases. Here, as Dr. Daniel, the independent peer reviewer commissioned by Wells Fargo to assess Harrison's claim, stated, the record was incomplete and his "opinion as to whether [Harrison's] psychiatric status limited her functional capacity [could not] be provided." J.A. 394. Wells Fargo was repeatedly put on notice that Harrison was seeking psychiatric treatment. In fact, it even commissioned an independent reviewer to assess whether her mental condition prevented her from returning to work. That very reviewer made clear to the plan administrator that the record was not sufficient to render a decision. At the time it commissioned the review, Wells Fargo had been notified that Harrison was seeking mental health treatment from Dr. Glenn. Wells Fargo had Dr. Glenn's contact information, but it only provided Dr. Daniel with Dr. Petrizzi's information. Dr. Daniel contacted Dr. Petrizzi, Harrison's primary care physician who referred him to Dr. Glenn for additional documentation. However, Dr. Daniel did not take the additional step of contacting Dr. Glenn directly.

Unlike our earlier cases, the record did not refute Harrison's claim of disability. To the contrary, Harrison's medical records for her thyroid condition alone present a close case. She was undergoing multiple surgical procedures for a large mass in her chest that was causing her pain and tracheal

16

compression. One week after her first surgery she notified Wells Fargo that she needed a second and significantly more serious operation to completely remove the mass from her chest. The fact of and need for these medical procedures Wells Fargo does not dispute. In the midst of it all, Harrison suffered the unexpected loss of her husband who had been a source of support after the earlier deaths of her mother and children. Her sister provided a statement that claimant was unable to care for herself. In addition, her primary care doctor noted her chest pain was made worse by anxiety and stress. In between her surgeries, and before the mass had been fully removed from her chest, it was hardly unlikely that Harrison would be unable to return to work. On such a close record, Wells Fargo's process was simply not the collaborative undertaking that ERISA envisions. A denial on such a basis cannot satisfy ERISA's full and fair review requirements.

B.

Here, the Plan documents are consistent with ERISA provisions -- including the requirement that notification of a denial must "state the reasons why [the] claim was denied and reference the specific STD Plan provision(s) on which the denial [was] based." J.A. 486. The Plan requires claimants to submit proof of disability, which may include "medical records, test results, or hospitalization records." Id. at 479. However, it

also authorizes Liberty, once a release has been signed, to "contact [a claimant's] physician to obtain medical information concerning [the] disability." Id. The Plan likewise requires that Liberty notify claimants where sufficient medical information is lacking and "describe the additional information needed and explain why such information is needed." Id. at 486.

The Plan further and properly provides that it is the "responsibility [of the claimant] to ensure that Liberty receives requested medical proof." Id. at 481. Here, the plan administrator contends Harrison defaulted on that obligation because she was told to submit all necessary medical information and she failed to provide any records from Dr. Glenn.

And yet, Harrison did in fact submit proper documentation authorizing Liberty to contact her treating physicians on June 23, 2011, and Liberty relied on that release to contact Drs. Petrizzi, Van Himbergen, and Hollings throughout the claims process. Absent notice to the contrary, it would have been perfectly reasonable for Harrison to assume that the plan administrator had done the same with Dr. Glenn, especially since she provided Wells Fargo with his contact information in her request for appeal. See id. at 134-35. Yet, notwithstanding the release and contact information, neither Liberty nor Wells Fargo got in touch with Dr. Glenn's office for records or evidence regarding her mental disability claim.

18

Furthermore, if an initial claim is denied, the Plan requires that where additional information is needed "the claims decision [must] describe the additional information needed and explain why such information is needed." Id. at 486. Wells Fargo failed to comply with this requirement of the Plan. Although Wells Fargo was on notice that Harrison was receiving treatment for potentially debilitating psychological trauma, it never made clear to her that records from Dr. Glenn were missing and needed -- noting only vaguely and deep into a long letter that she should provide relevant medical information without ever once mentioning Dr. Glenn by name. See id. at 56-57. The Plan itself recognizes that, consistent with ERISA, the claims process must be collaborative not adversarial, especially in light of the fact that claimants must often proceed without the aid of legal counsel. Wells Fargo should have made clear that records from Dr. Glenn were absent from the record and necessary to perfect Harrison's claim. It was not appropriate under the circumstances to require that the claimant wonder and guess.

Ultimately, as we have earlier mentioned, Harrison was undergoing difficult diagnostic tests and repeated surgeries when she suffered the sudden loss of her husband just several years after the loss of her mother and children in a house fire. There was a real possibility under the terms of the Plan that she could have demonstrated a medically certified condition that

19

prevented her from returning to work in between her surgeries. The record at hand provides evidence of claimant's mental and physical distress. Dr. Petrizzi, Harrison's treating physician, referenced her psychological condition in his records, and increased her dosage of anti-depressant drugs during the relevant timeframe, and her sister's statement detailed debilitating panic attacks. Wells Fargo was put on notice that Harrison was seeking treatment for psychological ailments in addition to thyroid disease and yet failed to undertake the same minimal effort to obtain records from Dr. Glenn that it properly took with regard to records from Drs. Petrizzi, Van Himbergen, and Hollings. Instead, it denied Harrison benefits on an incomplete record. A plan administrator cannot decline to undertake the most nominal efforts to obtain readily available information that was made known to the Plan, that was plainly material to the claim, and that could well have provided the proof crucial to Harrison's success. At least, under the terms of the Plan here, Wells Fargo should have instructed Harrison plainly and specifically that additional records from Dr. Glenn were needed to perfect her claim.

IV.

It bears repeating that the primary responsibility for providing medical evidence to support a claimant's theory rests with the claimant. See Berry, 761 F.2d at 1008. Claimants are

20

more familiar with their medical history and their treating physicians and are far better suited to provide the evidence necessary to support a claim for disability. However, once a plan administrator is on notice that readily-available evidence exists that might confirm claimant's theory of disability, it cannot shut its eyes to such evidence where there is little in the record to suggest the claim deficient.

Like our sister circuits, we now adopt this narrow principle – narrow because it does not undercut claimant's responsibility to provide medical information nor impose a duty on plan administrators to fish for medical information on the mere possibility that it may be helpful in some remote way. Here, however, Wells Fargo breached the fiduciary duty owed to Nancy Harrison when it neither sought readily available records from Dr. Glenn that might have confirmed her theory of disability nor informed her in clear terms that those records were necessary. Even absent those records, this was a close case. The judgment must be reversed and remanded to the district court with instructions to return this case to Wells Fargo for proceedings consistent with this decision.

<u>REVERSED AND REMANDED</u>

21