**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 15-2105**

---

STEPHEN WILKINSON,

        Plaintiff - Appellee,

    v.

SUN LIFE AND HEALTH INSURANCE COMPANY, d/b/a Sun Life Financial,

        Defendant - Appellant,

    and

DOLAN & TRAYNOR, INC. EMPLOYEE HEALTH AND WELFARE BENEFIT PLAN,

        Defendant.

---

Appeal from the United States District Court for the Western District of North Carolina, at Statesville. Richard L. Voorhees, District Judge. (5:13-cv-00087-RLV-DCK)

---

Argued: October 27, 2016        Decided: January 5, 2017

---

Before MOTZ and DIAZ, Circuit Judges, and Gerald Bruce LEE, United States District Judge for the Eastern District of Virginia, sitting by designation.

---

Affirmed by unpublished opinion. Judge Lee wrote the opinion, in which Judge Motz and Judge Diaz joined.

**ARGUED:** Joshua Bachrach, WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP, Philadelphia, Pennsylvania, for Appellant. Norris Arden Adams, II, ESSEX & RICHARDS, P.A., Charlotte, North Carolina, for Appellee. **ON BRIEF:** Hannah Gray Styron Symonds, WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP, Philadelphia, Pennsylvania, for Appellant. Frank N. Darras, Susan B. Grabarsky, Phillip S. Bather, DARRASLAW, Ontario, California, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

LEE, District Judge:

Stephen Wilkinson ("Wilkinson") brought this action against Sun Life and Health Insurance Company (U.S.) ("Sun Life") to seek long-term disability benefits pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq. After approving the benefits claim under a policy that Sun Life issued to Wilkinson's former employer, Sun Life terminated benefits on the grounds that Wilkinson was not an active full-time employee when the policy took effect.

On cross-motions for summary judgment, the district court granted judgment in favor of Wilkinson. The key issue presented is whether the district court erred in holding that Sun Life, the administrator of an employee welfare benefit plan governed by ERISA, abused its discretion when it terminated Wilkinson's benefits. We hold that Sun Life abused its discretion when it terminated Wilkinson's benefits because he provided sufficient evidence to support his eligibility for coverage, and because Sun Life's decision to terminate benefits was not the result of a principled reasoning process and not supported by substantial evidence. We therefore affirm the district court's decision.

I.

A.

The facts relevant to this appeal are those probative of whether Wilkinson worked at least 30 hours per week as an active employee on May 1, 2004, when the policy at issue took effect.

In 1973, Wilkinson began working as the vice president of sales, operations, and distribution for Dolan & Traynor, Inc. ("D&T"). J.A. 10, 23.[1] D&T is a closely-held corporation based in New Jersey that distributes building products and plumbing specialties. J.A. 10, 23, 1110-15. Wilkinson earned an annual compensation of $434,300, and at some point prior to his disability, worked approximately 60 hours per week. J.A. 276, 1315-16. He also owned approximately 22% of D&T's stock. J.A. 91. Wilkinson has represented that his position at D&T was due to marrying the daughter of one of D&T's owners. J.A. 521. In August 2003, Wilkinson's wife passed away. J.A. 998. In the months that followed, Wilkinson began to struggle emotionally and physically, and he eventually developed a heart condition known as cardiomyopathy. Id.

At a D&T partner meeting in March 2004, Wilkinson and his business partners discussed his decline in health, his ongoing

_____

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

4

role with the company, and the possibility of him taking leave. J.A. 372-74. Subsequent to this meeting, Wilkinson wrote an email to his partners stating that over the preceding seven months, he typically worked from 9 a.m. to 5 p.m., aside from six weeks of paid time off. J.A. 373. Wilkinson also wrote, "I would like to feel better and will continue to try to return to being more productive working no more than 40 hour weeks. This all depends on my ability based on my current predicament." J.A. 373.

A second partner meeting occurred on April 13, 2004. J.A. 375. The partners discussed how D&T was in the midst of a critical time and needed all the partners to work diligently. Id. The next day, Wilkinson summarized the meeting in an email as follows: "My expressed desire to work 30-40 hours a week does not cut it with [the partners]. They are putting in extra hours, evenings/weekends and it is not fair." Id.

A third partner meeting occurred on April 21, 2004. J.A. 999. Wilkinson and his partners again discussed the possibility of Wilkinson taking leave. Id. According to court filings that Wilkinson filed in a separate 2007 lawsuit, "Timothy Dolan asked that [Wilkinson] take the leave now and [D&T] would continue to pay [his] salary until a written agreement was reached laying out the terms of [his] leave." Id. Wilkinson further claimed, "[b]ased on [D&T's] promise to work out an agreement within a

5

few weeks, I began a medical leave for an undetermined period of time, beginning May 7, 2004." Id.

On May 5, 2004, D&T's human resources department sent Wilkinson a document entitled "Response to Employee Request for Family or Medical Leave and Employee Acknowledgements of Obligations" (the "FMLA Form"). J.A. 201-03. The FMLA Form states, "[w]e are aware that you need this leave beginning on or about May 10, 2004 . . . . ." J.A. 201. The record reflects that Wilkinson took unpaid FMLA leave from May 7, 2004 until August 2004. J.A. 1466. In July 2004, Wilkinson informed D&T that he would be unable to return to work. J.A. 376.

B.

Eligible employees of D&T were covered under its Employee Health and Welfare Benefit Plan. J.A. 7, 22. Prior to May 1, 2004, the plan was insured by a different company, Unum. J.A. 1284-1312. Effective May 1, 2004, Sun Life issued a group benefits policy (the "Policy") to D&T to insure eligible participants and beneficiaries of its plan. J.A. 260, 1352-81. Sun Life served in the dual role of evaluating benefit claims and paying approved claims. J.A. 9, 23. Wilkinson submitted a benefits claim to Sun Life on August 18, 2004, which Sun Life approved. J.A. 927, 1449-53. Sun Life paid Wilkinson disability benefits for approximately four years from August

6

2004 until July 2008.  J.A. 248.  Sun Life also performed periodic reviews to determine whether Wilkinson remained eligible for long-term disability benefits.  J.A. 262.

In November 2007, Wilkinson filed an employment-related action in New Jersey state court against D&T, as well as his business partners Timothy Traynor, Michael Dolan, and Timothy Dolan (the "New Jersey Lawsuit").  J.A. 81-23.  Wilkinson alleged that he was fraudulently induced into resigning as an officer of D&T and signing a modification of his buyout agreement.  Id.  The parties eventually settled the suit under a confidential agreement.  J.A. 312.  At the time, the New Jersey Lawsuit had nothing to do with Wilkinson's benefits claim.  Id.

Sun Life sent Wilkinson the first denial letter on July 29, 2008, stating that he no longer qualified for long-term disability benefits.  J.A. 125-29.  This denial letter noted that Sun Life had recently learned of the New Jersey Lawsuit, and that Sun Life believed Wilkinson may have resigned from D&T because of disagreements with the partners, rather than medical reasons.  J.A. 128.  Regardless, Sun Life justified the first denial because it "concluded that there was no medical evidence to continue to support [Wilkinson's] claimed restrictions and limitations."  Id.  Importantly, Sun Life's "assessment of total disability [was] based on one's occupation [as a vice president] in the national economy, not by the job requirements of a

7

particular employer." J.A. 126. Sun Life claimed that although D&T described Wilkinson's "job as heavy duty," a vice president in the national economy fits "closer to the light physical demand level." Id. In January 2009, Wilkinson challenged the termination of benefits and provided evidence to rebut Sun Life's determination. J.A. 519-640. Wilkinson also challenged Sun Life's reliance on what duties a vice president performs in the national economy, as opposed to what duties he performed at D&T. See J.A. 521.

Sun Life sent Wilkinson a second denial letter on May 13, 2009. J.A. 61-69. This letter noted that a physician described Wilkinson's "cardiac status as causing only slight limitation in physical activity." J.A. 63. The letter also stated a functional capacity evaluation revealed that Wilkinson "had the capacity to perform his occupation as it is typically performed in the national economy." J.A. 63. Nevertheless, Sun Life expressly stated that it was "not addressing any question of Disability at this time," and that it was denying coverage on different grounds. J.A. 69. Sun Life found Wilkinson ineligible for coverage under the Policy because, in its view, two declarations filed in the New Jersey Lawsuit indicated Wilkinson "was not meeting the requirements of an Active Full-time Employee at the time coverage became effective . . . on May 1, 2004." J.A. 68. Thus, five years after Wilkinson left D&T,

8

Sun Life asserted a new theory for why Wilkinson did not qualify for coverage.

In January 2010, Wilkinson appealed the termination of his disability benefits a second time. J.A. 346-64. As part of Wilkinson's administrative appeal, a physician hired by Sun Life provided medical findings indicating that "Wilkinson would be precluded from the duties of his 'Regular Occupation' and was 'Totally Disabled.'" J.A. 45. This finding essentially foreclosed Sun Life's denial of benefits based on medical grounds.

Sun Life sent Wilkinson a third denial letter on July 12, 2010. J.A. 39-50. The sole issue at that point involved whether Wilkinson was "[p]erforming all the duties of [his] job on a Full-time Basis and working on a regular work schedule of at least 30 hours per week" when the Policy took effect. See id. To prove that he was an active full-time employee, Wilkinson provided Sun Life with a statement, emails regarding partnership meetings leading up to his leave of absence, a declaration from his CPA, applications that Wilkinson submitted to insurers for other purposes, and Social Security information. J.A. 44, 50. Sun Life rejected this information because it believed the evidence did not substantiate whether Wilkinson was an active full-time employee. See J.A. 45-46, 50. Instead, Sun Life relied upon two declarations filed in the 2007 New Jersey

9

Lawsuit as evidence of Wilkinson's ineligibility for coverage. See J.A. 48–49.

## C.

Wilkinson brought this case pursuant to section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), to determine his entitlement to long-term disability benefits under the Policy. J.A. 7–21. Having exhausted his administrative remedies, on June 18, 2013, Wilkinson filed suit against Sun Life in the United States District Court for the Western District of North Carolina. Id. Sun Life responded with a Counterclaim seeking repayment of $386,539.37, the amount of benefits Sun Life paid to Wilkinson prior to terminating benefits. J.A. 22–29. Wilkinson moved to dismiss Sun Life's Counterclaim, and later the parties filed cross-Motions for Summary Judgment. J.A. 30–35, 204–40.

On September 1, 2015, the district court published an opinion granting Wilkinson's Motion for Summary Judgment and awarding him benefits under the Policy. Wilkinson v. Sun Life & Health Ins. Co., 127 F. Supp. 3d 545, 568 (W.D.N.C. 2015). The district also denied Sun Life's Motion for Summary Judgment, and dismissed its Counterclaim as moot. Id. First, the district court determined that the ERISA abuse of discretion standard applied. Id. at 556–58. Next, under that standard, the

10

district court weighed the relevant factors to determine whether Sun Life's denial of benefits was reasonable. Id. at 562-68. In doing so, the court considered the FMLA Form even though it was not part of the administrative record. Id. at 560-62. Ultimately, the district court found that Wilkinson met his burden to show that he was covered under the Policy, and that Sun Life abused its discretion by denying benefits. Id. at 562. Sun Life filed this appeal.

## II.

As a threshold issue, we first consider the appropriate judicial standard of review. A participant or beneficiary of a plan covered under ERISA may bring a civil action to recover benefits due to him or her under the plan's terms. See 29 U.S.C. § 1132(a)(1)(B). The scope of judicial review in an action challenging an administrator's coverage determination under section 1132(a)(1)(B) turns on whether the benefit plan vests the administrator with discretionary authority. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Helton v. AT & T Inc., 709 F.3d 343, 351 (4th Cir. 2013). When a plan does not vest the administrator with discretionary authority, a district court reviews the administrator's coverage determination de novo. Helton, 709 F.3d at 351 (citing Williams v. Metro. Life Ins. Co., 609 F.3d 622, 629 (4th Cir. 2010)). In

11

contrast, when a plan vests the administrator with discretionary authority to make eligibility determinations, a district court reviews the administrator's decision under the abuse of discretion standard.  See Helton, 709 F.3d at 351.

Here, the district court applied the abuse of discretion standard because a document attached to and delivered with the benefits plan contained discretionary language.  J.A. 223.  The parties agree that if this document, referred to as the "Statement of ERISA Rights," is considered part of the plan, then the document clearly grants Sun Life discretionary authority.  While Sun Life contends that the abuse of discretion standard applies, Wilkinson contends that de novo review applies because the Statement of ERISA Rights was not part of the benefits plan.  We need not reach the issue of whether the district court appropriately considered the document part of the plan because the standard of review is not outcome determinative.  Even under the abuse of discretion standard, which is more favorable to Sun Life, we conclude that the district court properly granted judgment in Wilkinson's favor.

Accordingly, we review the district court's grant of summary judgment to Wilkinson de novo, applying the same abuse of discretion standard employed by the district court.  See Harrison v. Wells Fargo Bank, N.A., 773 F.3d 15, 20 (4th Cir. 2014); Williams, 609 F.3d at 629.  Under the abuse of discretion

12

standard, this circuit will uphold the decision of a plan administrator if the decision is reasonable, even if this court would have reached a contrary conclusion upon an independent review. See Fortier v. Principal Life Ins. Co., 66 F.3d 231, 235 (4th Cir. 2012). A decision is reasonable when the decision "is the result of a deliberate, principled reasoning process, and is supported by substantial evidence . . . ." Helton, 709 F.3d at 351 (internal quotation marks and citation omitted). In evaluating whether a plan administrator abused its discretion, this circuit has identified the following eight nonexclusive "Booth factors":

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan, 201 F.3d 335, 342-43 (4th Cir. 2000).

### III.

We next consider Sun Life's three primary contentions concerning whether the district court: (1) improperly considered

13

evidence outside the administrative record; (2) erroneously shifted the burden to prove coverage eligibility from the claimant to the plan administrator; and (3) erroneously held that Sun Life abused its discretion. Each contention is addressed in turn.

A.

Sun Life contends that the district court improperly considered evidence outside the administrative record by relying upon Wilkinson's FMLA Form as evidence of when he ceased working.

When a court reviews a coverage determination under the abuse of discretion standard, generally, consideration of evidence outside of the administrative record is inappropriate. Helton, 709 F.3d at 352 (citing Sheppard & Enoch Pratt Hosp. v. Travelers Ins. Co., 32 F.3d 120, 125 (4th Cir. 1994)). However, in Helton, this circuit stated that courts reviewing ERISA cases should take "a more nuanced approach to consideration of extrinsic evidence on deferential review, rather than embracing an absolute bar." 709 F.3d at 352. Under Helton, "a district court may consider evidence outside of the administrative record on abuse of discretion review in an ERISA case when [1] such evidence is necessary to adequately assess the Booth factors and [2] the evidence was known to the plan administrator when it

14

rendered its benefits determination." Id. at 356. By focusing on what evidence was known to the plan administrator at the time, courts within this circuit maintain their ability to review coverage determinations and prevent administrators from omitting unfavorable evidence from the administrative record. See Helton, 709 F.3d at 353.

On appeal, as in the district court, both prongs of this two-part test are satisfied. The first prong is met because evidence of the FMLA Form is necessary to adequately assess at least three Booth factors. The third Booth factor instructs courts to assess the "adequacy of the materials considered to make the decision," 201 F.3d at 342, and here the FMLA Form is probative of what Wilkinson told his employer and when, J.A. 201. The fifth Booth factor instructs courts to assess "whether the decisionmaking process was reasoned and principled," 201 F.3d at 342, and here Sun Life's process consisted of granting benefits, denying benefits for medical reasons, reversing the medical determination, and then denying benefits for purportedly not being an active full-time employee. The eighth Booth factor instructs courts to assess "any conflict of interest [the fiduciary] may have," 201 F.3d at 343, and here Sun Life's motives are at issue because of its dual role of evaluating and

15

paying benefits claims, see Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 112 (2008).[2]

The second prong required to consider an FMLA Form that is not part of the administrative record is met because Wilkinson's request to take FMLA leave was known to Sun Life when it rendered its benefits determination. First, Sun Life's May 2009 denial letter acknowledged that it received in 2004 a letter from Wilkinson indicating that he took FMLA leave. See J.A. 445. Second, the May 2009 denial letter acknowledges Wilkinson had "assert[ed] that his [FMLA] leave of absence commenced on May 7, 2004." J.A. 451. Third, Wilkinson provided to Sun Life a declaration in January 2010 stating that D&T "prepared a memorandum confirming" his request to take FMLA leave, J.A. 311, and Sun Life acknowledged receipt of the declaration in its July 2010 denial letter, J.A. 265.

Because the FMLA Form is necessary to adequately assess the Booth factors and the evidence was known to Sun Life, the district court properly considered that evidence. As discussed

---

[2] Applying the Supreme Court's precedent in Glenn, this circuit has held that a plan administrator's conflict of interest does not change the judicial standard of review, and instead is viewed as "one factor among the many identified in Booth for reviewing the reasonableness of a plan administrator's discretionary decision." Williams, 609 F.3d at 631.

16

further below, we too will consider such evidence in evaluating whether Sun Life abused its discretion.

B.

Next Sun Life contends that the district court erroneously shifted the burden to establish coverage eligibility from the claimant to the plan administrator.

"ERISA represents a careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." Conkright v. Frommert, 559 U.S. 506, 507 (2010) (internal quotation marks and citation omitted). Plan administrators have a fiduciary duty to balance "the obligation to guard the assets of the trust from improper claims, as well as the obligation to pay legitimate claims." Harrison, 773 F.3d at 20 (internal quotation marks and citation omitted). Further, under ERISA, plan administrators must set forth "the specific reasons" for denial and must "afford a reasonable opportunity . . . for a full and fair review . . . ." Id. (quoting 29 U.S.C. § 1133).

On the one hand, this circuit has consistently stated, "the primary responsibility for providing medical evidence to support a claimant's theory rests with the claimant." Harrison, 773 F.3d at 24 (citing Berry v. Ciba-Geigy Corp., 761 F.2d 1003, 1008 (4th Cir. 1985)). Claimants are more familiar with their

17

medical and work history. See Harrison, 773 F.3d at 24. Additionally, claimants, their physicians, and their employers are typically better suited to provide the evidence necessary to support a claim. See id. This circuit has "recognize[d] that plan administrators possess limited resources," and has never required them "to scour the countryside in search of evidence to bolster" a claim. Id. at 22. On the other hand, this circuit has also stated that "once a plan administrator is on notice that readily-available evidence exists that might confirm claimant's theory of disability, it cannot shut its eyes to such evidence where there is little in the record to suggest the claim [is] deficient." Id. at 24.

Here, the district court stated that in its view, Wilkinson satisfied his burden of showing that he was covered under the Policy. Wilkinson, 127 F. Supp. 3d at 562. Then pursuant to relevant Booth factors, the district court concluded that Sun Life abused its discretion because its decision-making was not reasoned and principled and was not supported by substantial evidence. Id. at 562–68. We challenge Sun Life's contention that the district court's decision should be construed as demanding an investigation that "leave[s] no stone unturned." Compare id. at 567, with Appellant's Br. at 31. The point is not that Sun Life failed to be an archeologist digging up evidence underneath a rock; quite the contrary here, Sun Life

18

shut its eyes to evidence in plain sight. For the reasons that follow, we agree that Wilkinson satisfied his burden to show he qualified for coverage, and that Sun Life abused its discretion by denying benefits.

C.

We next turn to the terms of the Policy, the evidence that Wilkinson provided to establish his entitlement to coverage, and the evidence that Sun Life relied upon to deny coverage.

The terms of the Policy limit coverage to "ACTIVE FULL-TIME EMPLOYEES WHO SATISFY THE COVERAGE ELIBILITY REQUIREMENTS." J.A. 1354. The Policy further provides: "You are an Active Full-time Employee actively at work on any day if on that day you are: . . . [p]erforming all of the duties of your job on a Full-time Basis and working on a regular work schedule of at least 30 hours per week . . . ." J.A. 1356.

Sun Life frames Wilkinson's evidence as relevant to the time period when he received compensation, not when he actually worked. Nevertheless, Wilkinson met his burden to provide sufficient evidence of his eligibility for coverage when the Policy took effect on May 1, 2004 (i.e., by providing evidence that he worked at least 30 hours per week). First, the FMLA Form indicates that D&T expected Wilkinson to take leave beginning "on or about May 10, 2004." J.A. 201-03. Second, a

19

Sun Life letter acknowledges: "[D&T] indicated May 7, 2004 as the last day that Mr. Wilkinson worked and that his work schedule at the time of the disability was 5 days per week, 8 hours per day." J.A. 261, 1487. Third, notes dated August 2004 from Wilkinson's physician lists May 7, 2004 as the "Date patient-ceased work because of disability." J.A. 1544. Fourth, an April 2004 email from Wilkinson to his business partners "expressed [his] desire to work 30–40 hours a week," J.A. 352, which at least implies his business partners wanted him to work more than 30 hours. Fifth, Wilkinson filed an unrelated insurance application with Security Mutual listing May 7, 2004 as the "Date [he] stopped work." J.A. 366.[3]

In contrast, Sun Life relies almost entirely upon two court filings in an unrelated New Jersey Lawsuit to establish that Wilkinson ceased working prior to May 1, 2004. First, Sun Life relies upon Wilkinson's declaration, which states:

> At that April 21st meeting, Timothy Dolan asked that I take the leave now and they would continue to pay my salary until a written agreement was reached laying out the terms of my leave. I agreed to take the leave of absence with Tim Traynor's agreement that, in a few weeks, they would have a written agreement prepared

---

[3] We are mindful that five years prior to today, in 2011, a typical vice president would likely have more electronic records evidencing his or her work. However in 2004, five years prior to Sun Life challenging Wilkinson's full-time status, expectations on what records might be available are different. Further, D&T explained to Sun Life that it did not keep attendance records for executives such as Wilkinson. J.A. 47.

for me and that my health insurance would continue. . . . <u>Based on their promise to work out an agreement within a few weeks, I began a medical leave for an undetermined period of time, beginning May 7, 2004</u>.

J.A. 115, 999 (emphasis added). <u>Second</u>, Sun Life relies upon a declaration from Wilkinson's former business partner, which states:

> Wilkinson spent very little time working from August 18, 2003 through May 7, 2004 because of emotional and physical problems. Despite a <u>drastic reduction in his attendance and production</u>, D&T voluntarily paid Wilkinson $451,300 from August 22, 2003 <u>until he ceased working completely on May 7, 2004</u>.

J.A. 917.[4]

In both instances, Sun Life hones in on the first underlined phrase (which favors its interest in denying benefits) and completely ignores the second phrase (which favors Wilkinson). Simply because the first phrase in Wilkinson's

---

[4] In its Reply Brief and during oral argument, Sun Life posited a new argument for denying benefits that was not raised in its denial letters, in the district court, or in its Opening Brief. Sun Life now argues that because a cardiologist diagnosed Wilkinson with serious health problems, he was incapable of "occasionally lift[ing] up to 100 pounds" as part of his job duties overseeing distribution operations. Appellant's Reply at 12 (quoting J.A. 499). This argument is unpersuasive for two reasons. First, ERISA requires plan administrators to "provide adequate notice . . . setting forth the specific reasons" for denial, and Sun Life did not deny coverage on this basis. <u>See</u> 29 U.S.C. § 1133(1). Second, Sun Life waived this argument on appeal. <u>See</u> <u>Helton</u>, 709 F.3d at 360 ("[B]ecause [defendant] failed to raise this argument before the district court, it is waived on appeal.").

21

declaration indicates someone "asked" Wilkinson to take leave "now" does not mean that he did in fact take leave that same day. It is not even clear if "now" means today, tomorrow, or next week, especially when the second phrase indicates that Wilkinson "began medical leave . . . beginning May 7, 2004." In addition, the first phrase in the other declaration referencing a "drastic reduction" in work schedule is ambiguous because a reduction for someone working 60 hours per week, as Wilkinson did at one point, could be reduced to 40 hours, 30 hours, or 5 hours. Sun Life also conveniently ignores that the second phrase clearly states Wilkinson "ceased working completely on May 7, 2004."

In sum, several Booth factors show that Sun Life abused its discretion, including: (1) the "language of the plan"; (2) the "adequacy of the materials considered"; (3) Sun Life's "decision-making process"; and (4) the indicators that Sun Life's conflict of interest played a role in its review process. See Booth, 201 F.3d at 342–43. Because Sun Life's coverage determination was not reasoned and principled and not supported by substantial evidence, the Court holds that Sun Life abused its discretion.

IV.

For the foregoing reasons, we affirm the district court's decision to grant Wilkinson's Motion for Summary Judgment, to deny Sun Life's Motion for Summary Judgment, and to dismiss as moot Sun Life's Counterclaim.

<u>AFFIRMED</u>

23