**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1251**

SCOTT GRIFFIN,

Plaintiff - Appellant,

v.

HARTFORD LIFE & ACCIDENT INSURANCE COMPANY,

Defendant - Appellee.

Appeal from the United States District Court for the Western District of Virginia, at Lynchburg.  Norman K. Moon, Senior District Judge.  (6:16-cv-00024-NKM-RSB)

Argued:  May 9, 2018                                     Decided:  July 31, 2018

Before WILKINSON and NIEMEYER, Circuit Judges, and Richard M. GERGEL, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Wilkinson and Judge Gergel joined.

**ARGUED:**  Michael D. Grabhorn, GRABHORN LAW OFFICE, PLLC, Louisville, Kentucky, for Appellant.  John Cowles Neiman, Jr., MAYNARD COOPER & GALE, P.C., Birmingham, Alabama, for Appellee.  **ON BRIEF:**  Andrew M. Grabhorn, GRABHORN LAW OFFICE, PLLC, Louisville, Kentucky, for Appellant.  William B. Wahlheim, Jr., Grace R. Murphy, Braxton S. Thrash, MAYNARD COOPER & GALE, P.C., Birmingham, Alabama, for Appellee.

NIEMEYER, Circuit Judge:

Scott Griffin commenced this action under the Employee Retirement Income Security Act ("ERISA") against Hartford Life and Accident Insurance Company ("Hartford Life") as the administrator of his employee welfare benefit plan, seeking a continuation of the long-term disability benefits that Hartford Life had terminated based on its conclusion that Griffin was no longer "disabled," as that term is used in the plan.

The district court granted summary judgment to Hartford Life, and Griffin filed this appeal, contending that the district court erred (1) in reviewing the administrator's decision for abuse of discretion, rather than *de novo*, and (2) in concluding that Griffin failed to provide evidence sufficient to support a conclusion that Hartford Life's decision to terminate the long-term disability benefits was unreasonable. For the reasons that follow, we affirm.

I

Scott Griffin became employed by MedQuist Transcriptions, Ltd., as a medical transcriptionist in April 2010. As an employee, he enjoyed the benefits of MedQuist's employee welfare benefit plan, which included life insurance, short-term disability benefits, and long-term disability benefits. MedQuist provided these benefits through group policies that it purchased from Hartford Life, which was also the administrator of the plan.

As relevant to this appeal, Griffin's long-term disability benefits were governed by a long-term disability policy that defined disability as follows:

Disability or Disabled means You are prevented from performing *one or more of the Essential Duties* of:

(1)      *Your Occupation* during the [180-day] Elimination Period;

(2)      *Your Occupation*, for the 24 month(s) following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and

(3)      after that, *Any Occupation*.

(Emphasis added).   The policy also stated that it was the claimant's responsibility to submit continuing proof of disability and provided that "[b]enefit payments will stop on the earliest of:  (1) the date You are no longer Disabled; (2) the date You fail to furnish Proof of Loss; [or] (3) the date You are no longer under the Regular Care of a Physician," among other limiting events.   Finally, the policy vested Hartford Life with "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of The Policy."

In September 2011, Griffin stopped working due to pain in his forearm and wrist, which prevented him from typing.  He submitted a claim for short-term disability benefits to Hartford Life, and Hartford Life approved his claim, paying him short-term disability benefits until March 2012, when those benefits were exhausted.  Griffin then applied for long-term disability benefits, adding to his claim complaints of pain not only in his forearm and wrist but also in his neck and right shoulder.  After Hartford Life obtained medical records from Griffin's medical providers, it approved Griffin's claim for long-term disability benefits in May 2012.  In its letter informing Griffin of its decision,

3

Hartford Life explained that his benefits would continue as long as he continued to meet the definition of "disabled" in the long-term disability benefits policy.

Thereafter, Hartford Life periodically contacted Griffin to monitor his condition and periodically requested updated medical records from his attending physicians. During this period, Griffin had been seeing Dr. Jonathan Carmouche, a neck and spine specialist, who concluded that Griffin's pain was caused by a herniated disc and recommended surgery. In March 2013, Dr. Carmouche performed the recommended surgery. A month later, he reported to Hartford Life that Griffin "ha[d] done well thus far." And again in June 2013, he completed an "attending physician's statement" form for Hartford Life indicating that Griffin had "[i]mproved." But Dr. Carmouche did not complete the functionality section of the form, consistent with his earlier statements to Hartford Life that he does not provide physical functionality assessments.

Because Hartford Life did not have information regarding Griffin's functionality post-surgery, it referred his claim to a medical case manager, who reviewed Griffin's file and concluded that it was not clear whether Griffin had any limitations on his functionality. This prompted her to recommend that additional information be obtained from Griffin. Thereafter, Hartford Life repeated its efforts to obtain functionality opinions from Griffin's medical providers, but again unsuccessfully. When, in August 2013, Hartford Life told Griffin that it was unable to obtain functionality opinions, he stated that he had not visited Dr. Carmouche since June 2013 and that he could no longer afford to see his primary care physician. He did indicate, however, that he had recently visited Dr. Cesar Bravo to treat tendonitis in his right elbow. When Hartford Life

4

inquired of Dr. Bravo, he reported that he had found no "significant bone or joint abnormality" in Griffin's elbow and concluded that Griffin's soft tissues were "unremarkable." Dr. Bravo, however, would not give Hartford Life a functionality opinion. Moreover, neither Dr. Carmouche's nor Dr. Bravo's records indicated any imposition of restrictions on Griffin's activities at that time.

In response to Hartford Life's further inquiry in December 2013 about Griffin's functionality, Dr. Carmouche told Hartford Life that he disagreed with a suggestion that Griffin was then "currently able to perform Sedentary Work on a full-time basis," but he added, "Not until [r]eleased by Dr. Bravo who is treating his tendonitis." But Dr. Bravo refused to provide Hartford Life with any functionality opinion, stating that he had seen Griffin only once. In further followups, both Dr. Bravo and Dr. Carmouche were consistently unwilling or unable to provide Hartford Life with a functionality opinion.

In February 2014, Hartford Life decided to send Griffin to another doctor to conduct an in-person medical examination to assess his functionality, but it was unable to locate an appropriate examiner close enough to Griffin at a reasonable cost. Accordingly, it decided to seek a peer-review assessment from Dr. Ronald Teichman based on Griffin's existing medical records. Dr. Teichman conducted the assessment and provided Hartford Life with a report in which he recounted that he had spoken to Dr. Carmouche and that Dr. Carmouche told him that he was "not convinced that Mr. Griffin w[ould] be able to tolerate working, even in a sedentary position," noting that Griffin had claimed that he could not "sit for more than 10 minutes." Dr. Carmouche added, however, "[T]he

5

likelihood is that the patient can actually do more than he thinks he can do." Thus, Dr. Teichman concluded in his report:

> I cannot recommend any restrictions or limitations [on Griffin] based on the very limited information that was sent to me. That does not mean that the client does not need restrictions. I just cannot recommend any based on this information. . . . Further, in discussion with Dr. Carmouche, he was, as I indicated at the beginning of this report, very hesitant to commit to any specific restrictions or limitations. He was, in fact, sufficiently hesitant that he declined to make any statements about what he thought the patient could perform, but rather, opted to order a functional capacity evaluation.

The case manager followed up with Dr. Teichman to obtain a more detailed assessment, but Dr. Teichman indicated that his only choice was to defer to Dr. Carmouche, who had stated that his patient reported being unable to sit for more than 10 minutes at a time. Dr. Teichman concluded that if that were so, it was "not compatible with functionality in a work environment."

In March 2014, Griffin reached a point when he had been receiving long-term disability benefits for two years, and, under the policy, the applicable definition of disability then changed from the inability to perform one or more of the essential duties *of his prior occupation* to an inability to perform one or more of the essential duties of "[*a*]*ny* [*o*]*ccupation*." (Emphasis added). Nonetheless, Hartford Life continued to pay Griffin long-term disability benefits based on Dr. Teichman's deferral to Dr. Carmouche's statement that Griffin had claimed he was not able to sit for more than 10 minutes at a time. In reporting to Griffin its decision to continue paying benefits, Hartford Life reminded Griffin that it would periodically be seeking continued proof from him of his disability.

6

Several days thereafter, however, Hartford Life decided to refer Griffin's claim to its special investigations unit to uncover more information. It decided to do so because Dr. Carmouche had stated that Griffin likely had more functionality than he realized; Griffin was rarely at home when Hartford Life called; and Griffin repeatedly insisted that Hartford Life's policy of following up on his condition every three months was too frequent.

The investigations unit thereafter videotaped Griffin leaving his home and driving to pick up his son from school. The investigator noted that Griffin "appeared to ambulate in a normal manner without observable bracing or support." On a different day, investigators videotaped Griffin leaving his home, driving to two stores, entering one store and "walk[ing] throughout the store at a quick pace," and then returning home about an hour later.

In May 2014, the investigations unit also conducted an in-person interview of Griffin to obtain his self-report of his medical history and current condition. In that interview, Griffin described his daily activities and explained that he felt that there were limits on his functionality. He also stated, however, that he had not seen a medical professional since November 2013 and that he was not consistently taking any pain medications. The investigator observed during the course of that interview that Griffin was walking, standing, and sitting without trouble, though at one point Griffin did stand up complaining of pain, and that he was capable of reaching and effectively using a pen.

Still lacking a current medical assessment of Griffin's functionality, Hartford Life sent renewed requests to Griffin's past medical providers for updated information. In

7

response, both Dr. Bravo and Dr. Carmouche indicated that they had not seen Griffin in some time. Griffin's chiropractor, Dr. Larry McGlothlin, did respond, returning a Hartford Life form in August 2014 stating that he was not currently providing restrictions or limitations on Griffin. But he also checked a box on the form indicating that Griffin "would [not] be capable of performing activity 40 hours a week" and added a note that he had restricted Griffin to two hours of activity per day in April 2012 and instructed him to see a surgeon. When Hartford Life followed up with a telephone call to determine whether Dr. McGlothlin's opinion on Griffin's functionality was current — as of August 2014 — or was based on Griffin's condition in 2012, Dr. McGlothlin said it was based on Griffin's condition in 2012, which was before Griffin had undergone surgery. Dr. McGlothlin also told Hartford Life that when he last examined Griffin in July 2014, Griffin appeared to be moving well and that he had not seen the need to impose any restrictions.

Based on all of the information that Hartford Life had compiled, it then conducted an employability analysis and concluded that there were several available jobs near Griffin that he could perform with his capabilities. Accordingly, in September 2014, it sent Griffin a letter informing him that it was terminating his long-term disability benefits because it had determined that he was no longer disabled as defined in the long-term disability policy.

Griffin filed an appeal with Hartford Life, enclosing a letter from Dr. McGlothlin in which he stated that, as of Griffin's last office visit in July 2014, he did not believe that the surveillance videos were inconsistent with Griffin's claims of limited functionality

8

and that he believed that "Griffin [was] being honest about his pain and discomfort." Dr. McGlothlin also explained that he "did not [give Griffin a disability slip earlier] because [he] thought [Griffin] was on disability at that time." When Hartford Life followed up with a telephone call to Dr. McGlothlin, however, Dr. McGlothlin acknowledged that the functionality opinion in his most recent letter was based solely on Griffin's self-reported information and not on any examination. Accordingly, Hartford Life's appeals unit advised Griffin, by a letter dated November 4, 2014, that he was not eligible for long-term disability benefits and affirmed Hartford Life's termination decision.

Griffin then commenced this action against Hartford Life under ERISA, 29 U.S.C. § 1132(a)(1)(B), seeking long-term disability benefits and claiming that Hartford Life improperly terminated them. On cross-motions for summary judgment, the district court granted Hartford Life's motion and denied Griffin's. This appeal followed.

II

At the outset, Griffin contends that the district court erred in reviewing Hartford Life's decision to terminate his long-term disability benefits for an abuse of discretion, rather than *de novo*. As he correctly points out, when a plaintiff challenges the denial or termination of benefits under an ERISA plan, the reviewing court must apply a "*de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). This is because "ERISA plans are contractual documents which, while regulated, are governed by

9

established principles of contract and trust law." *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 88 (4th Cir. 1996) (citing *Firestone*, 489 U.S. at 111). Thus, when the plan does confer discretionary authority on the administrator to determine eligibility, "courts do not review the merits of the administrator's decision, but rather decide only the contractual questions of whether the administrator exceeded its power or abused its discretion because only those inquiries are relevant to whether the administrator's decision breached the contractual provision." *Id*.

While Griffin acknowledges in this case that the relevant plan documents gave Hartford Life "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of The Policy," he argues that the decision to terminate his benefits was not made by Hartford Life, to whom this discretion was given by the policy, but instead by Hartford Fire Insurance Company, an affiliated corporation in The Hartford group of companies.[*] He bases this claim on the fact uncovered during discovery that W-2 tax forms indicated that the employees who corresponded with him and made the termination decision were paid by Hartford Fire and that they were employees of Hartford Fire. Thus, Griffin contends, because the long-term disability policy did not confer discretion on Hartford Fire to make the termination decision or allow delegation of that discretion by Hartford Life, Hartford Fire's decision had to be judicially reviewed *de novo*.

---

[*] The record shows that The Hartford Financial Services Group, Inc. is solely a holding company that has numerous subsidiaries, including Hartford Life and Hartford Fire, all comprising a group of companies referred to as "The Hartford."

Hartford Life does not dispute that the employees involved in reviewing and denying Griffin's claim for benefits were paid by Hartford Fire, but it does assert nonetheless that those employees were employees of Hartford Life, acting solely and exclusively on its behalf.

The record shows that Hartford Life issued the relevant disability policy and that Griffin submitted his claim to Hartford Life. All correspondence to him was written on The Hartford stationery and was signed by a person on behalf of Hartford Life, giving his or her job title at Hartford Life. Thus, the letter denying his claim was written on stationery headed with the logo "The Hartford" and signed by "Vanessa L. Balogh, Senior Ability Analyst, Hartford Life and Accident Insurance Co." Similarly, his appeal was denied by a letter on the same stationery and signed by "Mariann Letson, Ability Analyst, Hartford Life and Accident Insurance Co." And, there was virtually no variation from this in all the other correspondence that occurred between Griffin and Hartford Life. For example, Griffin received letters from Hartford Life signed by "David Sherman, Hartford Life and Accident Insurance Co.," "Sherri N. Alexander, Ability Analyst/JKV, Hartford Life and Accident Insurance Co.," "Karen R. Andreasmoses, Ability Analyst, Hartford Life and Accident Insurance Co.," and "Jennifer E. Battista, Ability Analyst, Hartford Life and Accident Insurance Co." Indeed, there is nothing in the record to indicate that Griffin was dealing with any company other than Hartford Life. And this was affirmed in affidavits submitted by Hartford Life, one of which stated:

> Senior Ability Analyst Vanessa L. Balogh denied Plaintiff's claim for benefits under the Policy, and Appeal Specialist Mariann Letson upheld that decision. . . . At the time of the claims decision at issue, Ms. Balogh

and Ms. Letson were solely responsible for adjudicating [long-term disability] claims under insurance policies issued by [Hartford Life]. . . . At all times, Ms. Balogh and Ms. Letson handled and managed Plaintiff's claim for benefits on behalf of [Hartford Life] and with the authority of [Hartford Life].

During discovery, however, Griffin learned that the relevant employees were paid by Hartford Fire, and on that basis alone, he now argues that Hartford Fire made the decision to deny his claim and his appeal. But in an affidavit provided by Hartford Life, the Director of Litigation and Appeals for the Group Benefits Department at The Hartford Financial Services Group, Inc., the parent holding company, explained that "for administrative purposes, Hartford Fire pays the salaries of *all employees* of [Hartford Financial's] subsidiary and affiliate companies." (Emphasis added). She added that both Balogh and Letson, who made the operative decisions in this case, "were solely responsible for adjudicating [long-term disability] claims under insurance policies issued by [Harford Life]" and "were not responsible for adjudicating any claims under insurance policies issued by Hartford Fire." Indeed, she stated that Hartford Fire did not even "issue or underwrite group or disability products." Finally, she affirmed that both Balogh and Lettson were acting at all relevant times "on behalf of [Hartford Life], not Hartford Fire."

On this record, the district court concluded that "[t]here was no indication to [Griffin] at the time that the employees were acting on behalf of [Hartford Fire]" and that Griffin "only later became aware of their affiliation through discovery in this litigation." Because "[a]ll of the evidence indicate[d] that the employees evaluating [Griffin's] claim were agents of [Hartford Life], which was given discretionary authority to interpret the

12

Plan," the court determined that "the abuse of discretion standard of review [should] apply."

We agree. The record plainly indicates that the individual decisionmakers involved with Griffin's claim were acting as agents of Hartford Life, such that Hartford Life, not Hartford Fire, determined that Griffin was no longer eligible for long-term disability benefits. All correspondence with Griffin was signed by individuals as employees of Hartford Life, and uncontested affidavits confirm that the employees involved with Griffin's claim were acting in that capacity. The only evidence suggesting that the relevant employees were instead employees of Hartford Fire was the W-2 tax forms indicating that Hartford Fire paid the employees' salaries. But, as Hartford Life explained, Hartford Fire was given the responsibility to pay *all of the employees* of subsidiary and affiliated companies in The Hartford group "for administrative purposes," and Hartford Fire was not involved in any of the underwriting, issuing of policies, investigations, communications, or decisions in this case. We also note that numerous federal courts faced with similar factual circumstances have reached the same conclusion. *See, e.g.*, *Potts v. Hartford Life & Accident Ins. Co.*, 272 F. Supp. 3d 690, 704–06 (W.D. Pa. 2017) (finding, in identical circumstances, that claim reviewers worked for Hartford Life even though they were paid by Hartford Fire); *Owens v. Liberty Life Assurance Co. of Boston*, 184 F. Supp. 3d 580, 585–86 (W.D. Ky. 2016) (finding that claim reviewers worked for Liberty Life even though they were paid by Liberty Mutual); *Zurndorfer v. Unum Life Ins. Co. of America*, 543 F. Supp. 2d 242, 256–57 (S.D.N.Y. 2008) (finding

13

that claim reviewers were authorized agents acting on behalf of Unum America even though they were officially employed and paid by its parent company).

We therefore affirm the district court's conclusion that Hartford Life, not Hartford Fire, determined that Griffin was no longer eligible for long-term disability benefits. And because the policy at issue expressly conferred discretion on Hartford Life to determine Griffin's eligibility, we review Hartford Life's eligibility determination for whether Hartford Life exceeded its power or abused its discretion, such that it breached the provisions of the policy conferring that authority. *See Haley*, 77 F.3d at 88.

## III

On the merits, Griffin contends that Hartford Life's decision to terminate his long-term disability benefits was an unreasonable exercise of discretion, giving four reasons in support of that contention. *First*, he argues that Hartford Life's decision rested on a flawed employability analysis that ignored Griffin's medical records. *Second*, he claims that Hartford Life, once having found him eligible for long-term disability benefits, should have been required to carry the burden of showing that Griffin's condition had improved. *Third*, he maintains that Hartford Life was required to have Griffin physically examined by a medical professional before finding him ineligible for disability benefits. And *finally*, he asserts that Hartford Life, given its dual role of determining eligibility for benefits and paying those benefits, had an inherent conflict of interest that "infect[ed] the claims process," rendering it unreasonable.

14

Hartford Life asserts, however, that its eligibility determination was the result of a thorough, reasonable, and fair process. It claims that the evidence in Griffin's case file supported a finding that he no longer satisfied the definition of "disabled" under the policy; that it did not have an obligation under the policy to have Griffin examined or to show a change in Griffin's condition to justify terminating previously granted benefits; and that nothing shows that any conflict of interest tainted its claims-resolution process.

At the outset, we note that, as is undisputed, Hartford Life's decision to terminate Griffin's long-term disability benefits fell *within the scope* of the discretionary authority conferred on it. The policy provides that Hartford Life had "full discretion and authority *to determine eligibility* for benefits" (emphasis added), and Hartford Life's decision indeed constituted a determination of eligibility for benefits. Griffin's position, rather, rests on his argument that Hartford Life nonetheless abused that discretion by acting unreasonably.

Judicial review of an ERISA administrator's decision for abuse of discretion requires us primarily to determine whether the decision was reasonable, a determination that is informed by a list of factors, including the adequacy of the supporting evidence, the rationality of the decisionmaking process, and the effect of any conflicts of interest. *See Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342–43 (4th Cir. 2000). Stated otherwise, "[t]o be held reasonable, the administrator's decision must result from a 'deliberate, principled reasoning process' and be supported by substantial evidence." *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 630 (4th Cir. 2010) (quoting *Guthrie v. Nat'l Rural Elec. Coop. Assoc. Long Term Disability Plan*, 509

15

F.3d 644, 651 (4th Cir. 2007)).  The reasonableness of an administrator's decision is assessed on the basis of those facts known to the administrator at the time its decision was made.  *See Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.*, 32 F.3d 120, 125 (4th Cir. 1994).

In this case, we agree with the district court that Hartford Life's decision was reasonable and therefore did not amount to an abuse of discretion.  The record readily shows that Griffin received a fair and thorough consideration of his claim and that Hartford Life's conclusion was reasonably supported by the available evidence.

As Hartford Life explained in its letter to Griffin terminating his benefits, none of the medical providers whom Griffin had seen were willing to give a current opinion on Griffin's level of functionality.  Moreover, Hartford Life collected video surveillance evidence of Griffin that showed him walking at a quick pace and moving "without observable bracing or support."  And Hartford Life's investigator, who conducted an in-person interview of Griffin, personally observed Griffin walking, standing, sitting, reaching, and effectively using a pen without significant trouble over the course of the interview.  Griffin also disclosed during the interview that he was not then receiving any treatment for his condition and that he had not seen any of his medical providers for over six months.  When Hartford Life sought recent updates from Griffin's doctors on his level of functionality, both Dr. Carmouche and Dr. Bravo responded that they had not seen Griffin in nearly a year and that they were not providing any functionality restrictions or limitations.  Griffin's chiropractor, Dr. McGlothlin, did state that he had imposed restrictions on Griffin in 2012, but he clarified that he was not restricting Griffin

16

anymore because, although Griffin had self-reported some pain, Dr. McGlothlin had observed him moving reasonably well.

Based on the information that Griffin supplied and that Hartford Life was able to obtain, Hartford Life then engaged in an employability analysis and concluded that there were several sedentary positions available within a close distance of Griffin and within his capabilities. The report of the analysis clearly identified positions for which Griffin possessed the required skills and qualifications. Griffin protests that these positions were not occupations for which he already had the necessary "education, training[,] or experience," as the policy requires, because the report stated that he could perform these jobs after receiving "minimal training." But the fact that the identified positions, like any other new position, might require initial orientation did not disqualify them as suitable alternative occupations for which Griffin was qualified. Hartford Life thus reasonably concluded that Griffin was not incapable of performing *any occupation*, as he was required to demonstrate under the policy to be qualified as disabled.

On Griffin's appeal of Hartford Life's termination decision, Griffin did provide additional evidence in the form of a letter from Dr. McGlothlin, in which he stated that he believed Griffin was "being honest" and that "he [was] very likely to have some disability." But in subsequent telephone calls between Hartford Life and Dr. McGlothlin, Dr. McGlothlin acknowledged that his assertions were based solely on Griffin's self-reported pain and that they were not based on any physical examination. Accordingly, Hartford Life's appeals specialist, after conducting an independent review of Griffin's

17

file, likewise reasonably concluded that Griffin had failed to show that he was eligible for the continuation of long-term disability benefits.

At bottom, the record reveals that the entire claims process was thorough, deliberate, and reasoned, and the evidence available to Hartford Life reasonably supported the discretionary decision it made. In making its decision, Hartford Life relied on observations of Griffin made by its investigators, Griffin's answers during his in-person interview, and general statements from his past medical providers that he likely had more functionality than he thought and that he had appeared to be moving normally. And again, the long-term disability policy states explicitly that it is Griffin's obligation, not Hartford Life's, to "furnish Proof of Loss," defined in part as evidence of the claimant's disability. As the district court noted, Griffin's only substantive evidence of his current disability was his own self-reporting regarding his condition, none of which provided objective medical evidence of his current functionality.

Griffin argues nonetheless that Hartford Life had the burden to show a *change* in his condition to justify terminating his long-term disability benefits because it had previously found him eligible for those benefits. In essence, he is asserting that Hartford Life had to show affirmatively that Griffin was no longer disabled. The policy, however, by its terms places the continuing burden of providing proof of disability on the claimant. Moreover, regardless of who had the burden, the available evidence supported a conclusion that Griffin's condition *did* improve. He was receiving treatment for his pain, including surgery in 2013, with the expectation that his pain would lessen. And by the time of his interview in 2014, Griffin stated he was no longer receiving treatment and was

18

not regularly taking pain medication. And the other evidence gathered by Hartford Life during its investigation indicated that he had improved and had at least attained a level of functionality that would enable him to perform some jobs in his community.

Griffin also insists that a provision in the policy required Hartford Life to have him physically examined before finding him ineligible for benefits. But this again is belied by the actual language of that provision. While the policy does provide that Hartford Life could require Griffin to submit to a medical examination if it were to deem it necessary to determine his eligibility, that provision does not impose a duty on Hartford Life to do so. Griffin nonetheless argues that even if Hartford Life was not contractually required to have him physically examined, it was still unreasonable for Hartford Life to deny his claim without the benefit of such an examination. While we acknowledge that there might be circumstances where that absence renders the decisionmaking process unreasonable, this is not such a case. Griffin directed Hartford life to Dr. Carmouche, Dr. Bravo, and Dr. McGlothlin, and none was able or willing to provide evidence sufficient to justify finding Griffin to be disabled. Moreover, Hartford Life collected additional information through its own efforts that led to the same conclusion. We cannot conclude that Hartford Life acted unreasonably in not seeking the opinion of yet another examiner, especially when it found that doing so would be cost-prohibitive. While ERISA administrators may not deny benefits without an adequate evidentiary basis, they are "under no duty to secure specific forms of evidence." *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 609 (4th Cir. 1999); *see also Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1008 (4th Cir. 1985) (noting that it was "not incumbent on [the administrator] as a matter of law to

19

secure evidence" in support of a claim of disability when it possessed reliable evidence that the claimant was not disabled).

Finally, on Griffin's conflict-of-interest argument, we recognize that an inherent conflict can exist when a plan administrator has both the discretion to make eligibility determinations and the responsibility for paying benefits to those found eligible. But in this case, there is no evidence that any such conflict impacted Hartford Life's adjustment and review of Griffin's claim. Griffin has only pointed to a few statements plucked from Hartford Life's records that, when given their appropriate context, do not support any reasonable inference of bias or self-interest. And the structural conflict, alone, is not sufficient to render Hartford Life's entire decisionmaking process unreasonable. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115–18 (2008).

For the reasons stated, the judgment of the district court is

AFFIRMED.