**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-2044

KENNETH WILSON, as Parent and Natural Guardian of J.W., a minor child,

Plaintiff – Appellant,

v.

UNITEDHEALTHCARE INSURANCE COMPANY,

Defendant – Appellee.

Appeal from the United States District Court for the District of South Carolina, at Charleston.  David C. Norton, District Judge.  (2:17-cv-03059-DCN)

Argued:  December 8, 2021                     Decided:  February 24, 2022

Before AGEE, THACKER and QUATTLEBAUM, Circuit Judges.

Affirmed in part, vacated in part, and remanded with instructions by published opinion. Judge Agee wrote the opinion, in which Judge Thacker and Judge Quattlebaum joined.

**ARGUED:**  M. Leila Louzri, FOSTER LAW FIRM, LLC, Greenville, South Carolina, for Appellant.   Cavender Crosby Kimble, BALCH & BINGHAM LLP, Birmingham, Alabama, for Appellee.   **ON BRIEF:**  Nathaniel W. Bax, FOSTER LAW FIRM, LLC, Greenville, South Carolina, for Appellant.  Robert L. Brown, WILSON, JONES, CARTER & BAXLEY, P.A., Columbia, South Carolina, for Appellee.

AGEE, Circuit Judge:

After health insurance payments for services provided to his minor son were denied, Kenneth Wilson filed a complaint in district court challenging that determination under 29 U.S.C. § 1132(a)(1)(B). The court affirmed the plan administrator's denial of coverage for the son's treatment from December 1, 2015, through May 15, 2016, concluding the plan administrator acted reasonably under the relevant factors identified in *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335 (4th Cir. 2000). In addition, the district court dismissed Wilson's claims arising from treatment his son received from May 15, 2016, through his discharge on July 31, 2017, for failure to exhaust administrative remedies.

Wilson appeals both dispositions. For the reasons set forth below, we affirm the district court's judgment against Wilson for the denial of coverage for services provided from December 1, 2015, through May 15, 2016. We have broken up the analysis for Wilson's claims related to the remaining services his son received based on a slightly different measure than the district court relied on, looking to whether the plan administrator denied coverage of the claims on or before January 26, 2017. Using that measure, we vacate the district court's dismissal of Wilson's claims for the administrator's coverage determinations that were made before January 26, 2017, and that were not for services provided from December 1, 2015, through May 15, 2016. Lastly, we affirm the court's dismissal of Wilson's claim for coverage determinations the administrator made after January 26, 2017, (regardless of when the corresponding services were provided) because Wilson failed to exhaust his administrative remedies for those claims. Accordingly, we

2

affirm in part, vacate in part, and remand the case to the district court for entry of an order remanding the relevant claims to the plan administrator for a full and fair review under ERISA and the Plan.

## I.

### A. The Plan

Wilson participates in the Towers Research Capital, LLC Welfare Benefit Plan ("the Plan"), a health insurance plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). Wilson's minor son, J.W., is a beneficiary of the Plan.

UnitedHealthcare Insurance Co. ("United") began insuring the Plan on December 1, 2015, thus making it the plan administrator throughout the relevant period.[1] The parties agree that the Plan gave United, as plan administrator, discretionary authority to interpret its terms and make benefits determinations. While the Plan provides for coverage of both outpatient and inpatient, *i.e.*, residential, behavioral health care services, only "[m]edically [n]ecessary" inpatient health services and treatments are covered. J.A. 54. The medical necessity criteria require that a patient's care be provided in the least costly setting likely to produce an equivalent therapeutic result.

The Plan establishes the process for United to make benefits determinations and for beneficiaries to appeal adverse coverage determinations. The medical necessity

---

[1] Different versions of the Plan governed each calendar year at issue in this case, but the three versions contain substantially similar relevant language. The district court and parties rely on the 2016 version and neither party has noted a reason not to do so. We therefore rely on the 2016 version.

determination is made during a "Utilization Review" process. J.A. 55. That process can occur before, during, or after a health care provider performs the services for which coverage is sought. If the administrator denies coverage for lack of medical necessity, beneficiaries can pursue two levels of internal review as well as an external review.[2] Beneficiaries have 180 days after receiving notice of an adverse benefits determination to initiate a first-level appeal and must file a second-level appeal "within 45 days of receipt of the final adverse determination on the first level Appeal." J.A. 58. The Plan requires the administrator to acknowledge a member's request to appeal "within 15 calendar days of receipt," *id.*, and further requires notification of each level's appeal decision within 30 days of receiving the request.

### B. J.W.'s Treatment

Over a two-year period from July 2015 to July 2017, J.W. received residential treatment to address mood and behavior issues. Until that time, he'd never received inpatient psychiatric treatment, despite years of medication and counseling. J.W. was first admitted to residential treatment at Change Academy at Lake of the Ozarks ("CALO") after experiencing behavioral issues, including "struggl[ing] with emotional regulation, depression, anxiety, anger and general mood swings." J.A. 2353. At that time, he'd been diagnosed with disruptive mood dysregulation disorder, generalized anxiety disorder, attention-deficit/hyperactivity disorder, and an unspecified neurodevelopmental disorder. Two months before the coverage periods at issue in this case, he was moved from CALO

---

[2] The external appeal is governed by other deadlines and criteria that are not at issue in this case.

to an area hospital because he had suicidal thoughts and had threatened to kill himself, though he was released back to CALO after a four-day stay.

This case involves claims for coverage of J.W.'s residential treatment at CALO from December 1, 2015 (when United took over the Plan's administration) until July 31, 2017 (when J.W. was discharged). As discussed in the analysis that follows, the parties and the district court divided Wilson's claims into three groups based on the dates of service ("DOS"). The First DOS encompasses services CALO provided from December 1, 2015, through May 15, 2016. The Second DOS encompasses services CALO provided for three periods in 2016: July 16–31, 2016; August 1–15, 2016; and November 1–30, 2016. The Third DOS encompasses all other dates of services CALO provided from May 15, 2016, through J.W.'s discharge.

### C. The Claims

#### 1. Claims for Coverage During the First DOS

United denied Wilson's claims for the First DOS based on its finding that J.W.'s residential treatment was not medically necessary. A letter from United explained that coverage was unavailable because J.W. "was admitted for inpatient treatment of his mood problems" that "did not need the 24-hour monitoring provided in a residential setting [given that] care could have been provided at a lower level of care such as partial hospital or intensive outpatient services." J.A. 2873. Specifically, a board-certified psychiatrist made the initial benefits determination based on CALO's records and other clinical records concerning the services provided to J.W. She determined that J.W. made progress in the months preceding the First DOS such that he did not satisfy the Plan's criteria for

5

residential treatment. She pointed in particular to the lack of evidence that J.W. had a severe lack of behavioral control, required frequent medication changes, or needed 24-hour monitoring.

On Wilson's behalf, CALO appealed the denial of coverage for the First DOS. Consistent with the Plan's procedures, United assigned the appeal to a different psychiatrist who was not involved in the initial denial. After reviewing "all aspects of clinical care involved in [J.W.'s] treatment" and discussing J.W.'s condition with his treating psychiatrist, the appeal psychiatrist upheld the initial determination to deny benefits. J.A. 2889. In sum, he concluded that J.W.'s "behaviors had improved" by December 1, 2015, such that any disruptive episodes could have been safely treated in an outpatient setting. *Id.*

CALO next sought an external appeal, which similarly upheld the denial as not medically necessary.

### 2. Additional Claims for Coverage

As the First DOS claims were being reviewed and appealed, J.W. continued to be treated at CALO, and CALO continued to submit claims for those residential services to United. However, United denied these claims, again finding a lack of medical necessity for inpatient treatment. As the claims were denied, United sent multiple Explanation of Benefits ("EOB") letters to Wilson, setting out the reasons for United's decision and explaining Wilson's rights and responsibilities under ERISA and the Plan.

On January 26, 2017, Wilson's counsel faxed a letter to United indicating that she had been "retained to represent [Wilson] in connection with the appeal of [United's] denial

6

of his health insurance benefits." J.A. 2930. The letter's subject line identified three specific claim numbers, which were for CALO's services provided during the time periods the parties and district court later designated as the Second DOS. The letter also stated that Wilson's "appeal is for the claims referenced above as well as any and all denied claims related to treatment received at [CALO]." *Id.*

The January 26 letter identified two purposes for writing. First, it stated that Wilson "do[es] wish a review of the denial of Mr. Wilson's claim pursuant to 29 U.S.C. § 1133" and indicated that although counsel "request[ed] that [United] begin [its] review," she did "not wish for [United] to complete the review until [she was] able to submit to [United] all of Mr. Wilson's medical records," which she was in the process of obtaining. *Id.* Counsel indicated that it was "absolutely essential" that United consider those records "as a part of this review." *Id.*

Second, the letter asked United for "a complete copy of each and every document upon which [it had] based [its] denial of Mr. Wilson's claim," including "any medical documents, substantive documents, the plan document and any internal guidelines or regulations which [United] ha[d] used in evaluating [the] claim." J.A. 2931. As support for the right to obtain copies of these records, the letter referenced "29 U.S.C. § 1132(c) and 29 U.S.C. § 1133 as interpreted by the Fourth Circuit Court of Appeals in *Ellis v. Metropolitan Life Insurance Company*, 126 F.3d 228 (4th Cir. 1997) and the Code of Federal Regulations interpreting 29 U.S.C. § 1133." *Id.* The letter reiterated its position that Wilson must "be given the documentation upon which his claim has been denied so

7

that [he has] a full and fair opportunity to respond to the same should he deem it appropriate." *Id.*

Attached to the January 26 letter were two signed documents: (1) a "Confirmation of Representation and Authorization for Release of Records and Reports," Wilson's Letter re: Court Order at 1, *Wilson v. UnitedHealthcare Ins. Co.*, No. 20-2044 (4th Cir. filed Dec. 13, 2021), ECF No. 45, and (2) a "Medical Authorization for Release of Records and Other . . . Identifying Information" to comply with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") ("the HIPAA authorization form"), J.A. 2932.

The confirmation of representation form contains a signature on a line for the "client" to sign, followed by Wilson's social security number and birthdate. It states that the attorney who sent the January 26 letter had been retained to represent Wilson "in connection with [his] claim for health insurance benefits" and that Wilson authorized United to send his counsel "any and all information, which may be requested, from any medical provider, [his] insurance company or [his] employer regarding [him]." Wilson's Letter re: Court Order at 4, ECF No. 45.

The HIPAA authorization form similarly sought to authorize counsel to obtain copies of "patient" J.W.'s records that would otherwise be protected by privacy laws. In a section setting out the "Authorization and Scope" of the release, it identified ten categories of materials, including medical and psychiatric records, hospital records, laboratory reports, and medical opinions. J.A. 2932. It also authorized various entities to "discuss [J.W.'s] history, condition, treatment, claim and bills" with counsel. *Id.* The HIPAA authorization form acknowledged that "to be valid[, the form] must comply with 45 C.F.R.

8

§ 164.508." *Id.* The form contains an illegible signature on the line for a patient to "sign[] on his or her own behalf." *Id.* The lines for a client to sign "on behalf of another person" and to indicate the basis for that authority to sign are blank. *Id.*

Although United internally categorized the January 26 letter as an attorney's request for release of information, it did not respond to the letter, produce any documents, or initiate an appeal.

On February 24, 2017, counsel sent a second letter to United, which again specifically identified the three claim numbers associated with the Second DOS. It referenced the January 26 letter as having "notified" United that Wilson "was appealing" the denial of J.W.'s benefits and attached a copy of the prior letter. J.A. 2933. The letter observed that counsel had "not received any documents from [United] which [were] responsive to [her] attached request for documents." *Id.* And it reiterated that counsel could not "prepare or submit any substantive documents . . . to be considered on review until [United] provide[d her] the" previously requested documents. *Id.* A response from United was requested within ten days. Further, the letter stated that if United did not provide the requested documents within the ten days, Wilson would be left with the assumption "that further attempts to exhaust administrative remedies [were] futile" and would instead "file suit" under ERISA. *Id.*

United again internally categorized the letter as an attorney's request for release of information, but did not respond, provide copies of documents, or initiate an appeal.

D. The Litigation

In November 2017, Wilson filed a complaint, which he later amended, in the U.S. District Court for the District of South Carolina, alleging that United improperly denied health insurance benefits for J.W.'s residential treatment at CALO. More broadly, Wilson pled that United denied him a "full and fair review" of his claims under ERISA. J.A. 7.

United responded, raising substantive and procedural grounds. Substantively, it asserted that Wilson was not entitled to benefits because J.W. did not meet the standard of care for inpatient care under the Plan for the relevant timeframe. As such, United asserted the services were not medically necessary and thus were ineligible for coverage. Procedurally, it maintained that although Wilson had exhausted administrative remedies for claims related to the First DOS, he had failed to do so for the claims submitted for the Second and Third DOS. As such, it asked the court to dismiss that part of Wilson's case.

The parties filed cross-memoranda in support of judgment.[3]

The district court granted summary judgment to United. As to the claims for the First DOS, the district court applied the relevant factors the Court identified in *Booth*— which we detail below—and determined that United did not abuse its discretion in denying coverage because that decision "was the result of a deliberate, principled reasoning process and supported by substantial evidence." J.A. 2978. As for United's denial of claims for the Second and Third DOS, the court concluded Wilson had failed to exhaust his

---

[3] The court's ERISA management order relieved the parties of filing motions for summary judgment, but required them to submit memoranda in support of judgment and a stipulation setting out their positions on various questions.

administrative remedies and had not shown that exhaustion would be futile. The court determined that the January 26 letter requested a "Retrospective Review" under the Plan rather than an "appeal" and that United had no duty under the Plan or ERISA to respond to the letter because the Plan stated that an administrator's failure to respond to a request for review should be viewed as a denial subject to appeal. J.A. 2963. Accordingly, the court dismissed with prejudice Wilson's claims to the extent they were based on denial of coverage for services provided during the Second and Third DOS.

Wilson noted a timely appeal, and we have jurisdiction under 28 U.S.C. § 1291.

## II. First DOS

We first consider Wilson's argument that the district court should have held that United abused its discretion in denying his claims for coverage during the First DOS. In sum, he asserts that United's decision failed to consider "all relevant medical evidence in support of" coverage. Opening Br. 26. To assess this argument, we begin by reviewing the Plan's criteria for admission to an inpatient or residential treatment program, turn next to the *Booth* factors governing a court's review of a coverage determination, and then recount the district court's analysis. Lastly, we consider the record in light of Wilson's challenges to the district court's determination.

We review the district court's grant of summary judgment de novo, using the same standards as the district court to review the plan administrator's decisions. *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997). In the ERISA context, the Supreme Court has "significantly curtailed a court's ability to review a discretionary decision of the

11

administrators of an employee benefits plan," such that "a reviewing court may reverse the denial of benefits only upon a finding of abuse of discretion." *Id.*

## A. The Plan's Guidelines for Residential Treatment

To assist fiduciaries in making the medical-necessity determination, the Plan permits them to "develop and maintain clinical policies that describe the *Generally Accepted Standards of Medical Practice* . . .[,] prevailing medical standards and clinical guidelines supporting [medical-necessity] determinations regarding specific services." J.A. 62. United did so through "Level of Care Guidelines," which contain criteria relevant to all care and to behavioral health services specifically. J.A. 70. The generally applicable criteria for admission require that the condition for which the patient seeks coverage "cannot be safely, efficiently, and effectively . . . treated in a less intensive level of care," and that the assessments and treatment of the factors leading to admission "require the intensity of services provided in the proposed level of care." J.A. 72. In addition to this criteria applicable for all admissions, the particular guidelines for admission to a residential treatment center require: (1) that "[t]he member . . . not [be] in imminent or current risk of harm to self, others, and/or property"; and (2) that the factors that led to admission cannot "be safely, efficiently or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors." J.A. 70. Both the initial and continued residential treatment criteria point to the need for such services based on a behavioral or cognitive impairment that interferes with activities of daily life to the extent that the patient's or others' welfare is endangered. J.A. 70–72.

12

These standards govern both the utilization review that occurs during the initial benefits determination and during the appeals process.

## B.  *Booth*'s Legal Standard

In *Booth*, the Court set out a non-exhaustive list of factors to consider when determining whether an ERISA administrator abused its discretion. Those factors assist courts in undertaking their overarching and ultimate review "to determine whether the decision was reasonable," *i.e.*, "result[ing] from a deliberate, principled reasoning process and . . . supported by substantial evidence." *Griffin v. Hartford Life & Accident Ins. Co.*, 898 F.3d 371, 381 (4th Cir. 2018) (internal quotation marks omitted). Substantial evidence is evidence that "a reasonable mind might accept as adequate to support a conclusion." *Pearson v. Colvin*, 810 F.3d 204, 207 (4th Cir. 2015).

Courts should consider the following, non-exhaustive, factors under *Booth*: the Plan's language, the materials the administrator consulted in reaching its decision, whether the Plan has been interpreted consistently, "whether the decision was consistent with the procedural and substantive requirements of ERISA," the existence of "any external standard relevant to the exercise of discretion," and "the fiduciary's motives and any conflict of interest it may have." 201 F.3d at 342–43.

## C.  The District Court's Analysis

The district court weighed the relevant *Booth* factors and determined that United's decision to deny coverage for services J.W. received at CALO during the First DOS was the product of a principled and reasoned decisionmaking process. At the outset, the court observed that, under the Plan, United had full discretionary authority to determine

13

eligibility for benefits and there's no suggestion that it failed to follow the Plan's procedures in determining the First DOS claims. *See id.* at 343 (explaining courts should "examin[e] the language of the Plan to determine whether the provision of benefits is prescriptive or discretionary and, if discretionary, whether the plan administrator acted within its discretion").

The district court then examined "the adequacy of the materials considered to make the decision and the degree to which they support it." *Id.* at 342. It found that the denial determinations were made after considering adequate materials, which included "J.W.'s treatment history, [his specific] treatment while at CALO, his underlying medical conditions, his family involvement, drugs prescribed to [him], conversations with J.W.'s psychiatrist at CALO, and his complete medical history." J.A. 2973. And it observed that the denial determinations were later confirmed by an "independent, external reviewer" during Wilson's external review. *Id.*

The court also found that the decision-making process was reasoned and principled, and supported by substantial evidence. It observed, for example, that United followed Plan procedures and policies throughout the utilization review and first-level internal appeal. Further, the court determined that although "J.W.'s medical records show that he did exhibit isolated incidents that required emergency safety physical interventions during the First DOS, [when] taken in its entirety[,] the administrative record shows that [United's] decision for a denial of coverage was supported by substantial evidence." J.A. 2974.

Next, the court considered whether United's decision was consistent with ERISA's procedural and substantive requirements. In determining that it was, the court observed that

14

United complied with ERISA's time frames for making each step of the determination, Wilson was timely notified of its findings and next-step rights to appeal the decision, and Wilson did not dispute United's compliance with ERISA throughout its review of the claims for coverage during the First DOS.

*Booth* also provides that an administrator's compliance with any external standards are relevant to the reasonableness of its determination, so the district court reviewed New York's laws governing the denial of health insurance benefits.[4] Specifically, it observed that New York allows for an external review of the denial of benefits, and that United informed Wilson of that right. Wilson did pursue an external appeal, in which the external reviewer independently examined the record and agreed with the determination that J.W.'s treatment was not medically necessary. The court also noted that Wilson did not dispute United's compliance with New York law.

Lastly, the court considered United's motives and any potential conflicts of interest. Wilson had not asserted any perceived conflicts, but the court nonetheless observed that any potential conflict would be defeated by the external appeal's independent determination agreeing with United's determination.

Finding that the *Booth* factors weighed strongly in United's favor, the district court concluded that it had not abused its discretion in denying coverage for claims submitted for the First DOS.

---

[4] The Plan is subject to New York law.

D.  Analysis

Wilson challenges the district court's determination, but does not dispute most of its factor-specific analysis under *Booth*. Instead, he contests the specific conclusion that United's decision to deny was reasoned and principled, and supported by substantial evidence. He asserts that United "'cherry picked' evidence" because "the entirety of the administrative record" shows more than isolated incidents warranting physical intervention and, thus, residential treatment. Opening Br. 41–42. As support, Wilson points to "several" instances in which J.W. engaged in self-harm (scratching, cutting, and hanging over a balcony railing), admitted to suicidal ideation, and got into physical or verbal altercations with staff members or peers. Opening Br. 43. Wilson asserts that only by ignoring this record evidence could United conclude that J.W.'s time at CALO was "essentially unremarkable and uneventful" and thus deny coverage for claims based on the First DOS. *Id.*

Having reviewed the record and the admission guidance, we conclude that United acted within its discretion to deny J.W.'s claims for the First DOS. As a whole, the medical record establishes that J.W. routinely engaged in reciprocal conversations and interacted with both peers and staff. He did not require intensive psychological intervention. Indeed, it appears that J.W. saw a licensed psychiatrist only about one time each month.

Against that backdrop, the record does not show that J.W. required constant physical interventions for safety. The noted episodes occurred irregularly and thus do not call into question United's overarching assessment. Here, the district court fairly characterized the

16

six incidents Wilson identifies as "isolated" considering that they occurred on six days during the First DOS's five-month span. J.A. 2974.

These incidents do not substantially call into question United's discretion in denying benefits for the First DOS. In a situation with a more closely conflicting medical record to resolve, we observed that it is the ERISA fiduciary's "duty" "to resolve the conflicts" and "it is not an abuse of discretion for a plan fiduciary to deny benefits where conflicting medical reports were presented." *See Booth*, 201 F.3d at 345 (internal quotation marks, citation, and alteration omitted). So long as sufficient evidence supports the decision, and the process by which the determination was made is principled and reasoned, the Court has "no basis" to second-guess an administrator's denial of benefits. *Id.* at 346.

Before issuing a final determination to deny coverage, three levels of review occurred—the initial utilization review, the first-level internal appeal, and an external review. The three independent reviewers separately arrived at the same conclusion: the 24-hour residential setting of services provided at CALO were no longer needed by the beginning of—and throughout—the First DOS. *E.g.*, J.A. 2867–68 (denying coverage at the utilization review stage after determining that J.W. "did not need the 24 hour monitoring provided in a residential setting, and care could have been provided at a lower level of care" such as an "intensive outpatient setting with individual psychotherapy, family therapy and medication management"); J.A. 2889 (upholding the initial determination on appeal because during the First DOS J.W.'s "behaviors had improved" and "[h]e appeared to be able to continue his care at a day program," which was "available in [the Wilsons'] home area," and thus did not meet the criteria for residential treatment); J.A. 2856

17

(agreeing, at the external appeal stage, that residential treatment "was not medically necessary" because "[n]othing in the documentation reviewed indicates that this patient required or could benefit from 24-hour daily confinement, observation, and treatment" and that a "more appropriate treatment plan would have included intensive outpatient treatment with a very strong family therapy component while the patient lived in his community with his family"). That determination is consistent with the criteria United established pursuant to the Plan, which set out that coverage can be denied for not being medically necessary when care could have occurred at a less intensive setting.

* * * *

At bottom, Wilson has not identified a sufficient basis for concluding that United abused its discretion in denying coverage for the claims submitted for the First DOS. United's decision to deny coverage during that period "was the result of a deliberate, principled reasoning process and supported by substantial evidence." J.A. 2978. We therefore affirm the district court's entry of judgment in United's favor as to the decision to deny coverage for the First DOS.

### III. The Second & Third DOS

We next turn to Wilson's challenge to the district court's dismissal—for failure to exhaust remedies—of his claims based on United's denial of coverage for services provided during the Second and Third DOS. Wilson asserts he was excused from exhausting those remedies because he initiated an appeal and requested copies of documents, but United failed to respond to either, thwarting the Plan's internal review

18

process and making exhaustion futile. He contends the district court erred in holding that counsel's January 26 and February 24 letters (collectively "the 2017 letters") did not initiate an "appeal" of United's initial decisions to deny coverage and that United was required to respond and also to provide copies of requested materials to which he was entitled under ERISA and the Plan.

In response, United urges us to affirm the district court's dismissal of these claims. It asserts that the district court properly construed the 2017 letters to request something short of an unequivocal appeal of the denial of coverage. Further, it contends the 2017 letters could not operate as an appeal of any coverage denials falling within the Third DOS that post-date when the letters were written, *i.e.*, claims that were provided or denied after February 24, 2017. United also argues that it had no duty to respond to the letters' request for production of documents because all of the requested materials are privileged by HIPAA and the HIPAA authorization form was defective because it was not properly signed.

A.  ERISA's Exhaustion Requirement

Although "ERISA does not contain an explicit exhaustion provision," "an ERISA claimant generally is required to exhaust the remedies provided by the employee benefit plan in which he participates as a prerequisite to an ERISA action for denial of benefits under 29 U.S.C. § 1132." *Makar v. Health Care Corp. of Mid-Atlantic (CareFirst)*, 872 F.2d 80, 82 (4th Cir. 1989). Courts have imposed this requirement because it is consistent with the "Act's text and structure as well as the strong federal interest encouraging private resolution of ERISA disputes." *Id.* The exhaustion requirement means that claimants must

19

follow the Plan's internal procedures for a "full and fair review" of a plan administrator's denial of a claim for benefits. *Id.* at 83.

We have previously recognized that a failure to exhaust may be excused when pursuing internal remedies would be "futile." *Id.* More than "bare allegations of futility" must be demonstrated, however, as a claimant must come forward with a "clear and positive showing" to warrant "suspending the exhaustion requirement." *Id.* (internal quotation marks omitted); *see Hickey v. Digital Equip. Corp.*, 43 F.3d 941, 945 (4th Cir. 1995) (rejecting an assertion of futility when claimant did not file a written claim and alleged, with no further foundation, that doing so would have been "a mere formality if not a charade"). Further, an administrator's failure to "provide a reasonable claims procedure" under ERISA "entitle[s] [beneficiaries] to pursue any available remedies" and thus to "be deemed to have exhausted the administrative remedies available under the [P]lan." 29 C.F.R. § 2560-503-1(l)(1).[5]

When exhaustion is excused, the district court may consider "the claimant's entitlement to benefits in the first instance." *Riggs v. Ballard Tire & Oil Co. Pension Plan*

---

[5] Courts have taken different approaches in classifying the grounds for excusing exhaustion. Some courts have grouped a variety of reasons to excuse exhaustion under the umbrella term "futility." *E.g.*, *Brown v. J.B. Hunt Transp. Servs., Inc.*, 586 F.3d 1079, 1085 (8th Cir. 2009) (citing other circuit courts). Others use a narrower definition of futility, requiring, for example, proof that the claim would have been denied, and classifying other grounds for excusing exhaustion as something other than "futility." *Id.* at 1085–87 (declining to label an argument as "futility," but observing that it nonetheless was "a winner" that excused the claimant's failure to exhaust). While our cases have only previously discussed "futility," the labels don't necessarily matter because they lead to the same result—sufficient evidence, rather than a mere assertion, that relieves the claimant of navigating the administrative process before filing suit.

*& Tr.*, 979 F.2d 848, 1992 WL 345584, at *2 (4th Cir. 1992) (unpublished table decision) (citing *Licensed Div. Dist. No. 1 MEBA/NMU, AFL-CIO v. Defries*, 943 F.2d 474, 478–80 (4th Cir. 1991)). But in the case of procedural noncompliance with ERISA's full and fair review process, we have recognized that the appropriate relief is to remand for the administrative process to be properly applied. *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 239–42 (4th Cir. 2008).

We review the district court's determination that Wilson failed to exhaust his administrative remedies for abuse of discretion. *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 876 (4th Cir. 2011). A district court "abuses its discretion when it acts arbitrarily or irrationally, fails to consider judicially recognized factors constraining its exercise of discretion, relies on erroneous factual or legal premises, or commits an error of law." *Newport News Shipbuilding & Dry Dock Co. v. Holiday*, 591 F.3d 219, 226–27 (4th Cir. 2009).

## B. The Claims Affected by the 2017 Letters

Before analyzing the substantive requests made in the 2017 letters, we must first determine which claims they relate to and therefore which claims our analysis affects. Although the district court and the parties have treated the Second and Third DOS claims identically, we conclude that a more nuanced approach is required.

The 2017 letters indisputably address the claims for the entire Second DOS, that is, the services CALO provided on July 16–31, 2016; August 1–15, 2016; and November 1–30, 2016. As noted, the 2017 letters' subject lines referenced three claim numbers that corresponded with Wilson's claims for these three specific timeframes. The district court

21

and the parties carved out the claims for services provided during these three delineated timeframes as the "Second DOS." J.A. 2955. Because of this explicit cross-reference in the letters, any analysis of the 2017 letters' contents applies to the denial of coverage for services provided during the Second DOS so defined.

The record is less developed for the claims designated as the "Third DOS." J.A. 2958. This label served as a catch-all for claims relating to J.W.'s residential treatment at CALO that did not fall within the First DOS or Second DOS and for which United had denied coverage. Put another way, as described by the parties and the district court, the Third DOS encompasses claims submitted for services provided from May 16, 2016, (the day after the First DOS ended) to July 31, 2017, (the date of J.W.'s discharge), except for the claims submitted for services provided during the three timeframes comprising the Second DOS.

We conclude that it's appropriate to consider claims for services denied before the date of the January 26 letter as part of the analysis of the 2017 letters' substance, but that claims for services denied after that date do not reasonably fall within its scope. The text of the January 26 letter expressly stated that its requests pertained to "the claims referenced above *as well as any and all denied claims related to* treatment received at [CALO]." J.A. 2930 (emphasis added). Thus, the plain language of the letter encompasses more than just the claims for the Second DOS; it also refers to additional claims United had denied as of the letter's date. But it does not follow that the letter references all other past and future claims Wilson submitted for coverage of his son's treatment at CALO.

22

Setting aside the question of whether a letter *could* effectively pull in future denials of coverage, the January 26 letter did not do so. The letter repeatedly characterized both counsel's representation of Wilson and its specific requests in terms of claims that United had already denied. For example, the letter stated counsel's retention to represent Wilson "in connection with the . . . *denial* of his health insurance benefits," and elsewhere referenced Wilson's "*denied* claims" and the "*denial* of Mr. Wilson's claim." *Id.* (emphases added). This language looks only to United's past conduct. It does not make any requests about United's process for reviewing then-pending or not-yet-submitted claims, let alone clearly indicate that the letter's requests encompass future claims for services that had not yet been provided.

Consistent with this reading, one of the January 26 letter's purposes was to notify United that Wilson "d[id] wish a review" or an "appeal." *Id.* Regardless of what this request actually accomplished under the Plan, one cannot "review" *or* "appeal" a decision that has not yet been made. Similarly, the letter requested "medical documents" United relied on to deny coverage. J.A. 2931. Regardless of whether United needed to respond to that request, the request itself could only be made for claims that had been denied as of the time it was made. For these reasons, although the January 26 letter's contents pulled in more than just the claims comprising the Second DOS, it only encompasses additional claims for which United had already denied coverage.

The February 24 letter did not expand the scope of the January 26 letter because it merely cross-referenced and reiterated the requests made in the earlier letter.

23

In sum, when analyzing the substantive requests made in the 2017 letters, we are discussing a narrower number of claims than what the district court addressed—only those claims for which United had *denied coverage* as of January 26, 2017.[6] We will adopt the phrase "modified Third DOS" to refer to the subset of Third DOS claims affected by our analysis of the 2017 letters' requests. To reiterate, the modified Third DOS consists of any claims that are not part of the First DOS or Second DOS and that United had denied coverage for as of January 26, 2017. The analysis that follows concerning the 2017 letters relates solely to the Second DOS and the modified Third DOS.

### C. 2017 Letters' Request for Documents

Our review convinces us that the district court abused its discretion in dismissing Wilson's claims based on the denial of coverage during the Second and modified Third DOS. Given the interconnectedness of the various arguments, we begin our analysis with the thread that leads to the cleanest untangling for the parties upon remand: the 2017 letters' request for production of documents.

### 1. Underlying Facts & Law

Four facts are beyond dispute—First, quite apart from whether they initiated an appeal, the 2017 letters unequivocally requested that United provide certain materials to Wilson's counsel. The January 26 letter stated as its "second purpose" "to request a complete copy of each and every document upon which [United had] based [its] denial of

---

[6] On the record before us we cannot say what specific claims for which dates of service comprise the modified Third DOS. We leave for the parties to settle that issue on remand, with the cut off being that United denied coverage for those claims on or before January 26, 2017, (and are not part of the First DOS).

24

Mr. Wilson's claims. Such documents include any medical documents, substantive documents, the plan document and any internal guidelines or regulations which [United had] used in evaluating [the] claim." J.A. 2931. And, as noted earlier, the letter expressly referenced Wilson's right to review this "documentation" to prepare a response that would be used during the full and fair review of the prior adverse benefits determination. *Id.* The February 24 letter similarly informed United that counsel had not received "any documents" requested in the earlier January 26 letter, all of which counsel deemed necessary to prepare Wilson's response to the denial of coverage. J.A. 2933.

Second, United did not provide any of the requested materials or respond to the letters in any fashion.

Third, as a general matter, Wilson—whom the 2017 letters identified as a Plan participant, a fact uncontested by United—had the right to request and receive copies of the requested documents, which United would ordinarily be obligated to provide. For example, 29 U.S.C. § 1133 gives beneficiaries the right to a "full and fair review" of denied claims, part of which includes the right to request—and the obligation on administrators to "provide[], upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." 29 C.F.R. § 2560.503-1(h)(2)(iii); *see also id.* § 2560.503-1(h)(3) (stating this requirement applies to group health plans); 29 U.S.C. § 1024(b)(4) (stating that copies of plan documents are to be provided to participants "upon written request"); 29 U.S.C. § 1132(c) (addressing the forms of relief available when administrators refuse to supply information to which beneficiaries are entitled upon request). As it was required to do, the Plan

25

incorporated these principles. *E.g.*, UnitedHealthcare Choice Plus Certificate of Coverage

("Plan Document") at 242, *Wilson v. UnitedHealthcare Ins. Co.*, No. 2:17-cv-03059-DCN

(D.S.C. filed June 19, 2019), ECF No. 35-4 (stating that "[s]pecific guidelines and

protocols [to assist in determining if services are medically necessary] are available for

[Plan participants] upon request");[7] *see also id.* at 304, 312.

Fourth, Plan participants can authorize third parties to request copies of materials

on the participants' behalf. *See, e.g.*, 29 C.F.R. § 2560.503-1(b)(4) (permitting "an

authorized representative of a claimant" to "act[] on behalf of such claimant in pursuing a

benefit claim or appeal of an adverse benefit determination"); Plan Document at 304, ECF

No. 35-4 (permitting Plan participants to authorize a third party to request copies of the

participants' health information).

## 2.  United's HIPAA Defense

United does not dispute these factual points and acknowledges that it ordinarily

would have had a duty to provide Wilson with copies of the requested documents.

Nonetheless, United insists that it had no obligation to produce any materials because they

are all protected by HIPAA and Wilson's HIPAA authorization form was fatally defective.

Specifically, United asserts the signature on the authorization form does not satisfy

HIPAA's requirements for a valid authorization. The authorizing signature, which is

---

[7] United filed this document as part of its evidentiary appendix to the parties' joint stipulation in the district court below. *See* Evidentiary App. to Joint Stipulation, *Wilson v. UnitedHealthcare Ins. Co.*, No. 2:17-cv-03059-DCN (D.S.C. filed June 19, 2019), ECF No. 35. It is not included in full in the Joint Appendix, so the opinion cites the document that is part of the district court record as appropriate.

illegible, was on the line for a "client/patient" to sign "on his or her own behalf" as opposed to the line designated for a "client" to sign "on behalf of another person." J.A. 2932. United contends that because J.W. was a minor, he could not sign the HIPAA authorization form personally and was required to have an authorized individual sign on his behalf. Thus, United posits, either J.W. signed the form and that was ineffective, or else Wilson signed the form and it's ineffective because he signed on the incorrect line and failed to identify his authority to do so as required by 45 C.F.R. § 164.508(c)(vi). Either way, United argues the form did not comply with HIPAA's exacting standards and, as such, no documents could be provided to Wilson's counsel.

United further contends that it had no obligation under the Plan, ERISA, or HIPAA to notify Wilson's counsel that it would not produce any materials or to explain why. Indeed, United maintains that it could not contact counsel because doing so would *itself* violate HIPAA by disclosing protected information about J.W. Related to this broad view of HIPAA's scope, United asserts that HIPAA protected *all* the materials requested in the 2017 letters, including copies of the Plan and any internal guidelines or regulations that United used to evaluate any Plan participant's claims for coverage, including Wilson's.

### 3. Analysis of United's HIPAA Defense

HIPAA is a sometimes confusing and obtuse federal law that prohibits covered entities from "knowingly" disclosing an individual's "individually identifiable health information" "without authorization." 42 U.S.C. § 1320d-6(a), (b); 45 C.F.R.

§ 164.508(a)(1).[8] "Individually identifiable health information" is "a subset of health information," 45 C.F.R. § 160.103, and understanding the difference between the two terms of art aids in understanding the flaws in United's argument. "Health information" means information that "is created or received by a health care provider, health plan, public health authority, employer, life insurer, school or university, or health care clearinghouse" that "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual." 42 U.S.C. § 1320d(4); 45 C.F.R. § 160.103. "Individually identifiable health information" has the same initial requirements, but must also either "identif[y] the individual" or be of a type "to which there is a reasonable basis to believe that the information can be used to identify the individual." 42 U.S.C. § 1320d(6); 45 C.F.R. § 160.103.

### a. Request for Plan-Related Documents

Applying these definitions to the 2017 letters, it is clear that some of the requested materials should have been disclosed because they do not constitute and would not lead to J.W.'s "individually identifiable health information" and thus would not require a HIPAA-compliant authorization form before being provided to Wilson's counsel. Further, it's undisputed that the 2017 letters plainly identified Wilson as a Plan participant, such that he

---

[8] It is uncontested that United is a covered entity subject to HIPAA's limitations on the use and disclosure of protected health information. *See generally* 45 C.F.R. §§ 160.102(a), 164.500, 164.502.

had a right under the Plan and ERISA to obtain copies of certain generally applicable Plan-related documents upon request (or upon his authorized representative's request).

As the definition of "individually identifiable health information" demonstrates, to fall within this term's scope, the material must either identify or be such that it could reasonably be used to identify a specific individual. We fail to see how a copy of the Plan—applicable to all beneficiaries—could conceivably identify J.W. directly or indirectly. Similarly, the "internal guidelines or regulations" established pursuant to the Plan for determining medical necessity would not identify J.W. or lead to his identification. J.A. 2931. These are generic documents governing United's assessment of any beneficiary's claims. Further, the 2017 letters requested any "substantive documents" used to deny coverage as part of a utilization review. *Id.* United may have had in its possession additional documents that fall within this category, must be disclosed under ERISA, and do not bear the individual identifiers that would subject it to HIPAA. These three categories of materials share the common feature of lacking any contents that either identifies or could reasonably be used to identify J.W. personally. *See* 45 C.F.R. § 164.514(a) ("Health information that does not identify an individual and with respect to which there is no reasonable basis to believe that the information can be used to identify an individual is not individually identifiable health information.").

United was required under ERISA and the Plan to provide copies of all the foregoing information to Wilson's counsel irrespective of the validity of the HIPAA authorization form. *E.g.*, Plan Document at 312, ECF No. 35-4 (reiterating that Plan participants "are entitled to obtain, upon written request to the Plan Administrator, copies of documents

29

governing the operation of the plan"); 29 C.F.R. § 2560.503-1(g)(v) (setting out a group health plan's obligation to provide copies of "an[y] internal rule, guideline, protocol, or other similar criterion . . . relied upon in making [an] adverse [benefit] determination"); *id.* § 2560.503-1(h)(iii) (setting out a plan administrator's obligation to provide "upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits"). It possessed the January 26 letter describing the request as well as Wilson's confirmation of representation designating his counsel as a third party who could act on his behalf. As an undisputed plan participant, Wilson—or his designated representative—had the right to request these materials under both the Plan and ERISA, and United had a corresponding duty to provide them. Responding to that request would not have disclosed anything to identify J.W., as it would disclose only the Plan and related documents governing any plan participant's claims. United, however, failed to respond in any way.

Without copies of the Plan and guidelines, Wilson was put at a distinct disadvantage in understanding how to proceed. *Ellis*, 126 F.3d at 236–37 (observing that ERISA's extensive procedural requirements "have been read as ensuring that a full and fair review is conducted by the administrator[] [and] that a claimant *is enabled to prepare an appeal for further administrative review* or recourse to the federal courts" (emphasis added)). As but one example, United contends that the January 26 letter was not a proper request for an appeal under the Plan by pointing to criteria set out in the Plan documents (and not contained in the EOBs). But by failing to provide these documents, United violated its fiduciary obligations under ERISA and the Plan, and impeded the appeal process.

30

Upon hearing nothing from United in response to either of the 2017 letters, Wilson had reason to believe that United was not going to comply with the procedures set out in the Plan as to the Second DOS and modified Third DOS. The EOBs accompanying United's initial denial of coverage informed Wilson that he could "request copies (free of charge) of information relevant to [his] claim by contacting [United] at the above address." *E.g.*, J.A. 2907. Moreover, ERISA obligates administrators to respond to requests for information that ERISA requires the administrator to provide participants "within 30 days after [the] request." 29 U.S.C. § 1132(c)(1); Plan Document at 312, ECF No. 35-4 (reciting this participant right and administrator duty in the Plan's notice of ERISA rights).[9] The letters were sent January 26, 2017, and February 24, 2017, respectively, and Wilson heard nothing from United for well over 30 days.

United's failure to provide the requested Plan-related documents provides a "clear and positive showing of futility" in attempting further communications with it about the production of documents and warrants excusing Wilson from the exhaustion requirement. *Makar*, 872 F.2d at 82 (internal quotation marks omitted); *e.g.*, *Brown*, 586 F.3d at 1085–86 (concluding claimant was excused from failing to exhaust after the administrator failed to respond to repeated requests for documents she was entitled to under the plan and ERISA because, "[w]ithout the Administrative Record and other requested documents in hand, [she] was unable fully and fairly to prepare her appeal"); *Lanfear v. Home Depot, Inc.*, 536

---

[9] Copies of materials relating to the Plan and benefits determinations are not a mere courtesy. Indeed, ERISA authorizes courts to impose a daily fine for an administrator's failure to timely provide copies of materials that must be turned over upon request. 29 U.S.C. § 1132(c)(1).

31

F.3d 1217, 1224–25 (11th Cir. 2008) (observing that past cases had found "exhaustion was futile because plan administrators had denied a participant meaningful access to administrative proceedings by repeatedly ignoring requests for documents supporting the denial of benefits").

### b.  Request for J.W.-Specific Documents

In addition to the request to provide Plan-oriented documents, the 2017 letters also requested materials that do fall within the definition of "individually identifiable health information," most notably any "medical documents" United relied on to deny coverage. J.A. 2931. J.W.'s medical records and opinions about his diagnoses and treatment would contain J.W.'s name and other contents from which he could be reasonably identified. As such, those and similar materials with such markers that were responsive to the request required a HIPAA-compliant authorization form before they could be disclosed to counsel. *See* 45 C.F.R. § 164.508(a)(1) ("Except as otherwise permitted or required by this subchapter, a covered entity may not use or disclose protected health information without an authorization that is valid under this section. When a covered entity obtains or receives a valid authorization for its use or disclosure of protected health information, such use or disclosure must be consistent with such authorization."). United therefore was precluded by HIPAA from turning over these materials without a "valid" HIPAA authorization form.

As to the documents protected by HIPAA, it's not clear that Wilson's signed HIPAA authorization form complied with the relevant regulations. *Id.* To be valid, the form must meet certain criteria, including containing several "core elements." *Id.* § 164.508(b), (c). In relevant part, the authorization form must contain the "[s]ignature of the individual and

32

date," and "[i]f the authorization is signed by a personal representative of the individual, a description of such representative's authority to act for the individual." *Id.* § 164.508(b)(1)(ii), (c)(1)(vi); *see also id.* § 164.508(b)(2)(ii) (stating that an authorization from is "defective" if it has "not been filled out completely, with respect to an element described by paragraph (c) of this section").

But Wilson's HIPAA authorization form contained an illegible signature. The top of Wilson's HIPAA authorization form identifies J.W. as the patient; provides his social security number and date of birth; and identifies the Foster Law Firm, L.L.P., as the entity to whom HIPAA-protected information can be disclosed. The form is signed illegibly; it is simply not readable to determine who actually signed it. Nor does any surrounding information clear up that illegibility. The signature appears in the subsection for a "client/patient" to sign "on his or her own behalf" and appears above the typed word, "Client," suggesting it was signed by the individual who hired the Foster Law Firm, L.L.P., Wilson, despite being a request to disclose J.W.'s HIPAA-protected records. J.A. 2932. The next section's signature line is left blank, but is where a client should have signed "on behalf of another person." *Id.* That section also contains a designated space for identifying the document being attached to verify the signatory's authority to sign on behalf of the named patient, but that too was left blank. As noted, however, to be a valid signature authorizing the release of another individual's protected health information, HIPAA requires that the authorization form describe the basis for that authority. 45 C.F.R. § 164.508(c)(1)(vi). It's not clear that the signature on the form here satisfies HIPAA's requirements.

33

Separate from United's valid refusal to produce J.W.-specific materials without a valid HIPAA authorization form is the independent question of whether—as United contends—HIPAA prohibited it from alerting Wilson's counsel that the signature on the authorization form was illegible and that as a consequence it could not determine that the HIPAA authorization form complied with 45 C.F.R. § 164.508. The answer to that question is that HIPAA did not prohibit United from contacting Wilson's counsel. Doing so would take no particular legal expertise and would not disclose any individually identifiable health information. For example, United could have simply responded that it was in possession of counsel's January 26 letter, but the attached HIPAA authorization form contained an illegible signature that meant United could not determine whether the signature complied with 45 C.F.R. § 164.508's requirements for a valid authorization form. Such a straightforward response would not disclose any "health information" at all, let alone "individually identifiable" health information.

United's arguments to the contrary find no support in the definition of individually identifiable health information or the case law on which it relies. In response to questioning at oral argument, United cited *Tate v. N.C. Pepsi-Cola Bottling Co. of Charlotte, Inc.*, No. 3:09CV36–RJC–DSC, 2009 WL 3242117 (W.D.N.C. Oct. 5, 2009), as its "best case" to support the argument that it could not respond in any manner to the 2017 letters without violating HIPAA. There, the plaintiff's lawyer sought production of medical records from an entity subject to HIPAA, but failed to provide a HIPAA-compliant medical authorization form. The district court held that the covered entity could not "release [the plaintiff's] medical records, even to his attorney," without a HIPAA-compliant

34

authorization, nor could the entity "even confirm whether [p]laintiff received health care services from it" without that form. *Id.* at *1.

*Tate* is inapposite. Confirming that a specific individual received services from a specific provider may well involve individually identifiable health information because it conveys information about "the provision of health care" to an identified person. 42 U.S.C. § 1320d(4); 45 C.F.R. § 160.103. But responding to counsel's request for production of documents by noting that the attached HIPAA authorization form contains an illegible signature does not implicate any aspect of HIPAA-protected information.[10]

To be sure, concluding that HIPAA did not prohibit United from alerting Wilson's counsel to the illegible signature does not mean that United had an obligation to do so. That requires us to consider the scope of United's fiduciary duties under the Plan, ERISA, and our case law describing the plan administrator's duties in providing claimants with a full and fair review of the denial of their claims for benefits. Our assessment leads to the narrow conclusion that under the specific circumstances of this case, United had an obligation to notify Wilson's counsel of the illegible signature.

At the outset, ERISA's overarching structure supports our conclusion. The Act generally "imposes broad fiduciary responsibilities on plan trustees," requiring them to

---

[10] At the Court's instruction, the parties submitted supplemental letters on the question of whether HIPAA prohibited United from disclosing nonmedical documents in response to the 2017 letters. The cases United cites to support its position are distinguishable and reaffirm that the specific inquiry is not whether the materials conceivably or actually relate to health information in the abstract, but rather center on whether the recipient would be able to use that information or surrounding circumstances to connect that information to a specific individual's health, conditions, health care treatment, or payment for health care. 42 U.S.C. § 1320d(4); 45 C.F.R. § 160.103.

35

"perform their obligations with diligence" and to "discharge their duties 'solely' in the interest of plan participants and their beneficiaries." *Makar*, 872 F.2d at 83 (quoting 29 U.S.C. § 1104(a)(1)); *Aetna Health Inc. v. Davila*, 542 U.S. 200, 220 (2004) (observing that a plan administrator acts as a plan fiduciary when carrying out ERISA's "extensive requirements to ensure full and fair review of benefit denials"); *see also* Plan Document at 312, ECF No. 35-4 (notifying Plan participants that ERISA imposes duties on the plan fiduciaries to operate the Plan "prudently and in the interest of you and other plan participants and beneficiaries"). To permit a fiduciary such as United to remain silent under the circumstances presented in this case would hardly be consistent with this objective. It would sanction an administrator's silence in the face of attempts by an undisputed bona fide Plan participant, Wilson, to obtain materials to which he had a right under the Plan and ERISA.

United's failure to answer regarding the illegible signature is counter to an administrator's role under ERISA as a fiduciary who must discharge its duties in the interests of its participants and beneficiaries. We have previously recognized, for example, that although claimants bear "primary responsibility" for presenting their claims for review,

> ERISA does not envision that the claims process will mirror an adversarial proceeding where the [claimant] bear[s] almost all of the responsibility for compiling the record, and the [fiduciary] bears little or no responsibility to seek clarification . . . . Rather, the law anticipates, where necessary, some back and forth between administrator and beneficiary.

*Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 21 (4th Cir. 2014) (internal quotation marks and citation omitted) (first three alterations in original).

Had United alerted Wilson's counsel to the problem with the HIPAA authorization form, Wilson could have timely cured it and continued with the process established in ERISA for a full and fair review of the denial of his claims for coverage during the Second DOS and modified Third DOS rather than turning to the courts. That course would further ERISA's intended framework: "[t]he full and fair review procedural requirements serve two complementary purposes," "permit[ting] a plan's administrators to resolve disputes in an efficient, streamlined, non-adversarial manner" while also "ensur[ing] that a plan participant is protected from arbitrary or unprincipled decision-making." *Ellis*, 126 F.3d at 236.

We are careful to note the fact-specific nature of our holding as ERISA clearly places on claimants the ultimate burden of pursuing their claims. While we have recognized that plan administrators are not required to hand-hold a claimant through the review process, they are not entitled to sandbag the process either. *Cf. id.* at 237. We have previously recognized that because "plan administrators possess limited resources, and . . . there are practical constraints" on processing requests, the governing rule should be "one of reason." *Harrison*, 773 F.3d at 22. Here, as noted, United had multiple requests from Wilson's counsel, a signed confirmation of representation, and an illegibly signed HIPAA authorization form that implicated whether HIPAA's signature requirement had been satisfied. United's limited fiduciary duty was solely to notify Wilson's counsel about the illegible signature on the attached form. Doing so would not violate HIPAA because it would not have disclosed any individually identifiable health information, but would have fulfilled a limited fiduciary duty of United as the Plan administrator.

37

\* \* \* \*

In sum, United should have responded to the 2017 letters' request for copies of materials to which Wilson was entitled under ERISA, but it failed to do so. Those letters requested copies of the "plan document" and "internal guidelines or regulations" governing the denial of claims, J.A. 2931, materials that the Plan obligated United to provide to Wilson or his authorized representative upon request and which did not require a valid HIPAA authorization form before disclosure.[11] In addition, United could not substantively comply with the request to provide copies of J.W.'s individually identifiable health information (*i.e.*, the "medical documents, substantive documents," and other responsive materials that fall within this definition). *Id.* Nonetheless, ERISA and the Plan obligated United to respond to the request by notifying Wilson's counsel of the existence of the potentially defective HIPAA authorization form attached to the 2017 letters.

D.  Appropriate Relief and the 2017 Letters' Request for an Appeal

Wilson contended on brief and at oral argument that it would be appropriate for the district court to review the denial of its claims directly because, in his view, the 2017 letters requested an appeal of the denial of claims arising during the Second DOS and modified Third DOS. When questioned on the matter of relief at oral argument, however, Wilson stated that he had no objection to the Court remanding for the plan administrator to undertake the full and fair review in the first instance.

---

[11] As discussed, it's also possible that other "substantive documents" referred to in the 2017 letters, J.A. 2931, would have been responsive and also not subject to HIPAA protection, but that remains undeveloped in the record as it stands.

38

Having considered the parties' arguments about how to proceed and our precedent, we conclude the best course is to remand for the plan administrator to undertake a full and fair review in the first instance. That is our usual course when a plan administrator fails to comply with ERISA's procedural requirements. *Gagliano*, 547 F.3d at 240 (recognizing that in most instances, the appropriate remedy for an administrator's procedural noncompliance "is to remand the matter to the plan administrator so that a 'full and fair review' can be accomplished"); *accord Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 159 (4th Cir. 1993).[12] Following this course is more consistent with ERISA's structure, which contemplates a robust administrative process to resolve claims disputes and guarantees certain rights to Wilson that were denied to him. *See Gagliano*, 547 F.3d at 235.

As further support for this course, we have previously recognized that one purpose of the administrative "full and fair review" is to "make an administrative record for a court [to] review if that later occurs." *Id.* Here, we do not have such a record because the ordinary administrative process was short-circuited and the parties were never able to develop their positions as to the denied claims. Consequently, remand will afford the parties the

---

[12] In light of our determination to remand as a result of United's failure to produce materials relevant to Wilson's preparations for an appeal, we need not determine whether the 2017 letters effectuated an appeal on their own. Nevertheless, we briefly note that the district court's reason for finding the 2017 letters did not initiate an appeal was in error, as United conceded during oral argument. Contrary to the district court's finding, the Plan does not allow claimants to seek an intermediary review known as a "Retrospective Review" from which a formal appeal lies. Instead, the Plan defines a "Retrospective Review" to be the specific type of utilization review—*i.e.*, the type of *initial* benefits determination—that occurs after the services for which benefits are claimed have already been performed. Plan Document at 53–54, ECF No. 35-4.

"opportunity to make a meaningful administrative record" that the court could consider upon any future review. *Id.* To do so, the process should be reset to the time remaining on January 26, 2017, so that Wilson can provide a HIPAA-compliant authorization form attached to a new request for materials protected by HIPAA, receive those materials as well as the Plan and other materials discussed earlier that were not subject to HIPAA, and pursue a timely appeal.[13]

---

[13] We recognize that ERISA's times for response are essential for the timely processing of claims. Our decision to bypass the question of whether the January 26 letter initiated an appeal is bolstered by the fact that had United timely responded within 30 days to its request for materials, Wilson would still have had several weeks—and as to some claims, months—to provide a substantive response. Thus, even if the letters did not initiate an appeal, the process could have unfolded in a timely manner by the submission of additional materials requesting an appeal accompanied by additional support for that appeal.

The denial of benefits for claims relating to the Second DOS explain why this is so. The 180-day clock for initiating a first-level appeal begins upon the Plan participant receiving notice of the denial of his claims for benefits. The EOB statements denying coverage for services provided July 16 to 31, 2016, and August 1 to 15, 2016, are dated October 10, 2016, and the statement denying coverage for services provided November 1 to 30, 2016, is dated December 16, 2016. Wilson's January 26, 2017, letter was sent 108 and 41 days, respectively, after the earliest date on which he received notice of the denial of coverage, meaning that even if that letter did not initiate an appeal, he had 72 and 139 more days in which to do so. United was required to respond to a request for copies of documents within 30 days of the request, meaning that had it done so, Wilson would still have had over one month to initiate an appeal as to the first two claims and over three months to initiate an appeal as to the third claim.

Some of the earlier claims in the modified Third DOS may not have been timely if a request for an appeal was made on January 26, 2017. If so, then United can raise that as a new ground for denying a full and fair review on remand for those particular claims. But any claims that would have been timely as of January 26 should be treated the same as the claims for the Second DOS on remand—allowing Wilson to submit a new letter requesting an appeal and properly request materials to review as part of that process.

E.  Exhaustion of Claims United Denied after January 26, 2017

As for the claims that United denied after January 26, 2017, Wilson has failed to show that he exhausted his administrative remedies or that the futility exception should apply. To demonstrate exhaustion and excuse, Wilson relied solely on United's failure to respond to the 2017 letters. But since the 2017 letters did not apply to claims denied after January 26, nothing in the record would support a finding that Wilson exhausted his administrative remedies as to those claims. Nor has he shown futility because that requires a "clear and positive showing" that United would not follow the Plan's procedures for reviewing those denied claims. *Makar*, 872 F.2d at 82 (internal quotation marks omitted). Accordingly, we hold that the district court properly dismissed Wilson's claim arising from any requests for coverage that United denied after January 26, 2017.

IV. Conclusion

For the foregoing reasons, the judgment of the district court is affirmed in part and vacated in part, and the case is remanded for entry of an order to remand to United as plan administrator for a "full and fair review" of the claims submitted for the Second DOS and modified Third DOS.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED WITH INSTRUCTIONS*